UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| United States of America | ) | |
| | ) | |
| v. | ) | Docket # 1:05-cr- 10011 GAO-1 |
| | ) | |
| Jose Silva | ) | |
| | ) | |

## DEFENDANT'S SENTENCING MEMORANDUM
## AND MOTION FOR DOWNWARD DEPARTURE

Respectfully submitted,

/s/ Laurie C. Carafone

_____

Michael A. Collora (BBO No. 092940)
Laurie C. Carafone  (BBO No. 656399)
Dwyer & Collora, LLP
600 Atlantic Avenue
Boston, MA 02210
(617) 371-1000

Dated:   April 10, 2006

## TABLE OF CONTENTS

I.    **Introduction** ........................................................................ 1

II.   **Procedural Background** ...................................................... 3

III.  **Post-*Booker* Sentencing Considerations under §3553(a)**.................................. 3

IV.  **The Sentencing Guidelines** ................................................ 4

    A.   Probation's Calculations as to Loss Amount and Mr. Silva's Role in the Offense are Speculative and Unsupported By the Evidence as Viewed By Both Mr. Silva and the Government. .................. 5

        1.   *Probation's Calculation of Loss—Nearly Three Times the Loss Amount Calculated by the Government and the Defendant in the Plea Agreement— is Speculative and Without Any Factual Basis and Should be Disregarded by the Court.* .............. 5

        2.   *Probation's Assessment That Mr. Silva's Role in the Offense Warrants a Four Level Increase is Unsubstantiated by the Evidence and Should be Disregarded by the Court.* ...................... 7

           a.   The criminal activity did not involve five or more criminally responsible participants. ......................... 7

    B.   Mr. Silva Has Made Extraordinary Restitution ......................................... 9

IV.  **The §3553(a) Factors as Applied to Mr. Silva** ................................................ 12

    A.   The Nature and Circumstances of the Offense and Mr. Silva's History and Characteristics ................................................. 12

        1.   *Mr. Silva's Good Character and Difficult Personal Circumstances* ................................................ 12

        2.   *Mr. Silva's Offense* ................................................. 14

           a.   Description and circumstances of the offense................... 14

           b.   The calculated loss overstates the seriousness of the offense................................................. 15

|  | c. | Minimal obstruction | 18 |

|  | 3. | *Mr. Silva's Cooperation with the Government* | 19 |

| B. | The Kinds of Sentences Available | 20 |
| C. | The Need to Avoid Sentencing Disparity | 21 |
| D. | The Need to Provide Restitution | 22 |

**VI.** **The Minimally-Sufficient Sentence in this Case** ............................................... 22

| A. | A More Severe Sentence Will Not Achieve Greater Justice, Deterrence, Incapacitation, or Rehabilitation | 23 |

|  | 1. | *Just Punishment* | 23 |
|  | 2. | *Recidivism is Unlikely* | 24 |
|  | 3. | *Rehabilitation* | 26 |
|  | 4. | *Probation will Enable Mr. Silva to Pay Restitution* | 26 |

**VIII.** **Fine** ...................................................................................... 27

**VIII.** **Conclusion** ...................................................................................... 27

## TABLE OF AUTHORITIES

Simon v. United States, 361 F.Supp.2d 35 (E.D.N.Y. 2005)............................................ 26

United States v. Barkiek, 2005 WL 2334682, *6 (E.D.Va., 2005).................................. 18

United States v. Bean, 18 F.3d 1367 (7th Cir. 1994)...................................................... 9

United States v. Badaracco, 954 F.2d 928 (3d Cir. 1992) .............................................. 8

United States v. Booker, 543 U.S. 220 (2005)........................................................... *passim*

U.S. v. Broderson, 67 F.3d 452 (2d. Cir. 1995) .............................................................. 28

United States v. Carmona-Rodriguez, 2005 WL 840464, *4 (S.D.N.Y. April 11, 2005) 26

U.S. v. Coleman, 188 F.3d 354(6th Cir. 1999) (en banc) ........................................... 27,28

United States v. Colletti, 984 F.2d 1339 (3d Cir. 1992) ................................................... 8

United States v. Davis, 797 F.Supp. 672 (N.D. Ind. 1992)........................................ 10, 11

United States v. DeMonte, 25 F.3d 343  (6th Cir. 1994) .................................................. 9

United States v. Fernandez, 2006 WL 851670, at * 12 (2d Cir. 2006).......................... 19

United States v. Fiala, 929 F.2d 285, 289 (7th Cir. 1991) ............................................. 18

United States v. Gallegos, 975 F.2d 710 (10th Cir. 1992).............................................. 17

United States v. Gaind, 829 F.Supp. 669 (S.D.N.Y. 1993)............................................. 25

United States v. Jaber, 362 F. Supp. 2d 365  (D. Mass 2005) ............................... 3, 20, 21

United States v. Jimenez-Beltre, 440 F.3d 514, 528 at note 8 (1st Cir. 2006 .................... 4

United States v. Jones, 352 F. Supp. 2d 22 (D. Maine 2005) ........................................ 21

United States  v. Kim, 364 F.3d 1235 (11th Cir. 2004) ............................................. 10, 11

United States v. Lucania, 379 F.Supp.2d 288(E.D.N.Y. 2005) ...................................... 25

United States v. Lanese, 890 F.2d 1284  (2d Cir. 1989)................................................... 8

United States v. Manning, 955 F.2d 770 (1st Cir. 1992) .......................................... 18, 19

iv

United States. v. Oligmueller, 198 F.3d 669 (8th Cir. 1999)................................................ 9

United States v. Redemann, 295 F.Supp.2d 887 (E.D. Wisc. 2003) ............................... 24

United States v. Solano-Godines, 120 F.3d 957 (9th Cir. 1997........................................ 19

United States v. Stewart, 22 F.3d 76  (10th Cir. 1994)............................................... 15, 16

United States v. VanMeter, 278 F.3d 1156  (10th Cir. 2002)......................................... 8

United States v. Ward, 814 F.Supp. 23 (E.D.Va. 1993) ................................................. 26

## STATUTES:

M.G.L.A. 130 § 41    ........................................................................................... 17

322 CMR 6.26 (2) (b) ........................................................................................... 17

16 U.S.C. § 3372 (a)(1).................................................................................... 3, 17

16 U.S.C. 3372 (a)(2)(A) ....................................................................................... 17

16 U.S.C. §3373 (d) (1) (B) ..................................................................................... 3

18 U.S.C. §371    ...................................................................................................... 3

18 U.S.C. §1001    ...................................................................................................... 3

18 U.S.C. §3553(a)    ..................................................................................... *passim*

18 U.S.C. § 3553(a)(2).................................................................................. *passim*

18 U.S.C. §3561 (a)    ............................................................................................. 20

U.S.S.G. § 2B1.1(b)(D)....................................................................................... 5, 16

U.S.S.G. § 2B1.1, comment. (n.19(C)) .................................................................. 15

U.S.S.G. § 3B1.1    ............................................................................................... 7, 8

U.S.S.G. § 3B1.1 (a)    ........................................................................................... 7,8

U.S.S.G. § 3B1.1 (c)    ........................................................................................... 7, 9

U.S.S.G. § 3C1.1 ................................................................................................. 18

U.S.S.G. §§ 3E1.1 ................................................................................................. 9

U.S.S.G. §5A ................................................................................................. 20

U.S.S.G. §5C1.1 (f) ................................................................................................. 20

U.S.S.G. § 5E1.2(a) ................................................................................................. 27

U.S.S.G. § 5E1.2(d) ................................................................................................. 27

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| United States of America | ) | |
| | ) | |
| v. | ) | Docket # 1:05-cr- 10011 GAO-1 |
| | ) | |
| Jose Silva | ) | |

## DEFENDANT'S SENTENCING MEMORANDUM
## AND MOTION FOR DOWNWARD DEPARTURE

**I.    Introduction**

Defendant Jose Silva respectfully submits this memorandum in order to provide

information to assist the Court in fashioning a sentence "sufficient but not greater than

necessary" to achieve the statutory purposes of punishment, as required by 18 U.S.C.

§3553(a) in light of *United States v. Booker*, 543 U.S. 220 (2005).

*Booker* restored district courts' ability to fashion a sentence tailored to the

individual circumstances of the case and defendant by requiring courts to consider factors

other than the sentencing range prescribed by the United States Sentencing Guidelines.

Indeed, under Section 3553(a), courts are *required* to sentence below the range if such a

sentence would be sufficient to achieve the purposes of punishment.

Here, Mr. Silva respectfully requests that the Court consider several important

circumstances of this case in fashioning a sentence which in light of all the circumstances

should be no greater than a period of probation.  *First*, Mr. Silva's extraordinary restitution

in the form of a $150,000 civil penalty and an 18-month suspension of his fishing license

through a voluntary civil settlement with NOAA (National Oceanic & Atmospheric

Administration), ahead of any criminal charge, as well as the forced immediate sale due to

the suspension and fine of both his fishing vessels, and the loss of his livelihood and the only source of income for his family, have already resulted in substantial punishment. *Second*, the loss as calculated according to the "retail" price of the lobsters rather than the significantly lower "ex-vessel" price that Mr. Silva would have received for the lobsters, substantially overstates the seriousness of the offense. *Third*, Mr. Silva's good character and devotion to his family as evidenced by letters to the Court, as well as his sincere regret as to his conduct and cooperation with the Government, show that his criminal behavior was an aberrance and he poses little risk of recidivism, especially given the devastating loss of his livelihood and his age. *Fourth*, recent sentences for causing far greater degradation to the environment suggest probation is an appropriate sanction for Mr. Silva's much lesser violations.

These circumstances warrant a sentence substantially below that provided for by the sentencing guidelines. Mr. Silva submits that a period of probation with community service is an appropriate sentence in this case. A period of home or community confinement would not serve the interests of justice because under such sentences Mr. Silva would be unable to continue working as a fisherman --the only job he knows-- and thus he would be unable to earn enough money to pay back the final $42,000 installment of his NOAA penalty by December 2007, which installments he has so far paid on a timely basis. Fishing jobs require trips to sea that last several days or longer and therefore a nightly curfew is not feasible. After eighteen months without a fishing license and three months of trying to find a fishing job once his license was reinstated in January 2006, Mr. Silva finally secured a job as a crewman on a dragging fishing boat in early April. *See* Exhibit A (Letter of Firmino Perreira). Mr. Silva is very grateful for this opportunity,

2

however, it will require him to be at sea for periods of a week or more, making a nightly curfew impossible. Mr. Perreira has promised to continue to employ Mr. Silva if the Court grants probation.

## II.    Procedural Background

On December 20, 2005, Mr. Silva pleaded guilty to Conspiracy, in violation of 18 U.S.C. §371 (Count 1); Lacey Act, violations under 16 U.S.C. § 3372 (a)(1), (a)(4) and 3373 (d) (1) (B)(Counts 2 and 3); and False Statements, in violation of 18 U.S.C. §1001 (Count 4). Mr. Silva now stands before the Court for sentencing.

## III.    Post-*Booker* Sentencing Considerations under §3553(a)

The Court is no doubt aware of the broad ramifications of *United States v. Booker* for this proceeding. The sentencing guideline range is no longer binding on the Court, but is only one of five factors to be considered in determining the sentence. *Booker*, 543 U.S. at 258-60. The other four factors are (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the kinds of sentences available; (3) the need to avoid unwarranted sentencing disparity; and (4) the need to provide restitution. *Id.*; 18 U.S.C. § 3553 (a)(1), (a)(3).

In considering the Section 3553(a) factors, the sentencing guidelines are to be given no more or less weight than any other factor. *See United States v. Jaber*, 362 F. Supp. 2d 365, 370-76 (D. Mass 2005) (providing comprehensive analysis of why sentencing guidelines do not reflect statutory purposes of punishment).

3

Perhaps even more important, however, is that *Booker* establishes a new, independent limit on the sentence that can be imposed. The primary sentencing mandate of Section 3553(a) states that courts must impose the minimally-sufficient sentence to achieve the statutory purposes of punishment—justice, deterrence, incapacitation, and rehabilitation:

> The court shall impose a sentence *sufficient, but not greater than necessary*, to comply with the purposes sent forth in [18 U.S.C. § 3553(a)(2)].

18 U.S.C. § 3553(a) (emphasis added). This so called "parsimony provision" is not simply a factor to be considered in determining sentence; it represents a cap above which the Court is *statutorily prohibited* from sentencing—even when a greater sentence is recommended by the sentencing guidelines. *See United States v. Jimenez-Beltre*, 440 F.3d 514, 528 n.8 (1st Cir. 2006).

## IV.    The Sentencing Guidelines

Although not binding on this Court, under the Plea Agreement Mr. Silva and the Government calculated the offense level at 15. The Defendant refers the Court to the Plea Agreement for the calculation details and will not recount them here. The Government has agreed to recommend a sentence at the low end of the applicable guideline range as determined by the Court.

Under the terms of the Plea Agreement, Mr. Silva reserved the right to argue for a departure on the grounds that he has already provided extraordinary restitution. For the reasons stated below, Mr. Silva submits that the Court should depart on this ground. Before articulating the grounds on which he seeks a departure from the guidelines, however, Mr. Silva briefly addresses Probation's erroneous and unsubstantiated guideline

4

calculations in its draft Presentence Report as to the loss amount and Mr. Silva's role in the

offense and urges the Court to adopt the guideline calculations as to loss and role in the

offense agreed to by Mr. Silva and the Government in the Plea Agreement.

A.     <u>Probation's Calculations as to Loss Amount and Mr. Silva's Role in the Offense are Speculative and Unsupported By the Evidence as Viewed By Both Mr. Silva and the Government.</u>

Probation's calculations as to loss and role in the offense have been objected to

both by the Government and by Mr. Silva, and they should be rejected by the Court as

well. Probation in its draft Presentence Report makes its own guideline calculations that

differ significantly in two important respects from the calculations proposed by the

Government and Mr. Silva in the Plea Agreement. First, Probation calculates a loss

amount of $81,106 rather than the $37,240, resulting in a guideline enhancement of 8

levels rather than 6 levels. Second, Probation considers Mr. Silva's role in the offense to

merit a 4 level increase, while the Government and Mr. Silva agree that his role merits only

a 2 level increase.

            1.     *Probation's Calculation of Loss—Nearly Three Times the Loss Amount Calculated by the Government and the Defendant in the Plea Agreement— is Speculative and Without Any Factual Basis and Should be Disregarded by the Court.*

Probation's loss calculation cannot be supported by the evidence. Mr. Silva and the

Government agreed in the Plea Agreement that the retail value of the lobsters at issue was

$37,240 constituting a 6 level increase under U.S.S.G. § 2B1.1(b)(D)[1]. This figure

originated with government calculations based upon testimony and an expert opinion. In

its draft Presentence Report, Probation uses a vague and speculative analysis to calculate a

---

[1] Unless otherwise specified, all references to the sentencing guidelines are to the version effective November 1, 2003, which applies in this case. *See* U.S.S.G. §1B1.11.

loss amount of $81,106, nearly three times the amount agreed to by the Government and Mr. Silva. Mr. Silva primarily relies on his Objections to the PSR to explain his strong disagreement with Probation's analysis and calculation with respect to loss. However, Mr. Silva summarizes below his view of the basic flaws in Probation's analysis and further clarifies his position with respect to loss. For the reasons stated below, Mr. Silva urges the Court to reject Probation's proposed findings as to loss amount.

First, Probation's calculation is based on a flawed assumption that 50% of the lobsters in every catch during the four-year period at issue, were egg-bearing females. Probation's assumption is fundamentally flawed because, as explained in Mr. Silva's Objections to the PSR, the proportion of egg-bearing lobsters varies significantly throughout the year, and is highest in March, the time of the catch centrally at issue here. *See* Exhibit B (Affidavit of Kevin Ferreira) at para 11. The Government concluded it could *not* prove such a high proportion of egg-bearing females in each catch, and consequently assessed the loss amount at the level it could prove: $37,240. Nevertheless, Probation, without any additional information beyond that possessed by the Government, "assumes" that 50% of every catch was egg-bearing and from there adds an unsubstantiated $1.00 increase for "wholesale" price and an additional 30% increase for the "retail" price resulting in a whopping $11.95 per pound as the loss value. Probation further asserts that this information is derived from Mr. Silva's own fishing records, which is impossible since Mr. Silva's records list only "ex-vessel", and not "wholesale" or "retail" prices. Moreover, the industry standard mark-up from the "ex-vessel" to "wholesale" price is $0.25 per pound --not $1.00 per pound-- with an additional 30% increase for the "retail" price. *Id.* at para 5. Moreover, the 30% increase for "retail" is not a

true mark-up because it compensates for a 10-20% death rate of the lobsters sold to the retailer. *Id.* at para 10.

    2.    *Probation's Assessment That Mr. Silva's Role in the Offense Warrants a Four Level Increase is Unsubstantiated by the Evidence and Should be Disregarded by the Court.*

Probation's calculation as to Mr. Silva's role in the offense is also unsupported by the evidence. The guidelines provide adjustments to a defendant's sentencing offense level based upon the role which the defendant played in committing the offense. *See* U.S.S.G. § 3B *et seq.* Section 3B1.1 provides a range of adjustments to increase the offense level depending upon the size of the criminal organization and the degree to which the defendant was responsible for committing the offense. U.S.S.G. § 3B1.1 comment. (backg'd). Under subsection 3B1.1 (a), the sentencing court may adjust a defendant's offense level upward by four levels if the defendant acted as a "leader" or "organizer" of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1 (a). Where there are less than five participants and the activity was not "otherwise extensive" the sentencing court may adjust the offense level upward by two levels. U.S.S.G. § 3B1.1 (c). Mr. Silva and the Government have agreed to a two-level increase for Mr. Silva's role in the offense. Probation, however, has proposed a four-level increase for Mr. Silva's role in the offense. For the reasons stated below, the Court should only apply a two-level increase because that is all the evidence supports.

    a.    <u>The criminal activity did not involve five or more criminally responsible participants.</u>

As with its calculation for loss amount, Probation's proposed four-level increase for Silva's role in the offense is vague and speculative. As justification for a four-level increase, Probation states that the conspiracy "involved five or more participants (the

defendant plus the remaining four crew members)." PSR at ¶ 41. Probation cites to a section of the guidelines which does not exist ("3B1.3(A)"), though presumably it meant to cite to U.S.S.G. § 3B1.1 (a).

The criminal activity here did not involve four or more other "participants." To be counted as a "participant," a person must be one "who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. §3B1.1, comment. (n.1). The "offense" for which the participant must be criminally responsible includes "the offense charged, as well as the underlying activities and participants that directly brought about the more limited sphere of the elements of the specific charged offense." *United States v. Colletti*, 984 F.2d 1339, 1345 (3d Cir. 1992) (citations and internal quotations omitted). To be considered a participant pursuant to this section of the guidelines, the individual must have committed all of the elements of a statutory crime with the requisite *mens rea*, and the precise crime committed by each participant must be specified. *United States v. Badaracco*, 954 F.2d 928, 935 (3d Cir. 1992). Individuals who may have played some part in the commission of the offense, but who lack the requisite criminal intent, are not criminally responsible and therefore are not participants. *See United States v. VanMeter*, 278 F.3d 1156, 1166 (10th Cir. 2002). Each participant must be identified. *United States v. Lanese*, 890 F.2d 1284, 1293-94 (2d Cir. 1989).

Despite requests from Mr. Silva, Probation has failed to identify the "remaining four crew members" it must show are "criminally responsible" for a specified crime by a preponderance of the evidence in order to justify a four-level increase under §3B1.1(a). *See United States v. Badaracco*, 954 F.2d at 935. Nor, despite Mr. Silva's inquiries, has

Probation specified the *acts* of those yet unidentified crew members that actually render them criminally responsible for a specified crime. *See Id.*

As with the loss value calculation, the Government did *not* believe the evidence supported Probation's asserted a four-level increase here, because the evidence only suggested *two* "criminally responsible" participants— Mr. Silva and his son, Danny. The Government did *not* believe there was sufficient evidence to prove by a preponderance that any other crew members were actually "criminally responsible" for the crimes at issue here, and therefore it applied a two-level increase for Mr. Silva's role in the offense. *See* Plea Agreement at page 2; U.S.S.G. § 3B1.1(c). Probation does not base its four-level increase on any information beyond that which the Government and Mr. Silva possess. Thus, as with its murky loss "calculation" based on a vague guess rather than actual evidence, Probation should not argue for a four-level increase when it cannot even name the four additional "criminally responsible" persons.

     B.    <u>Mr. Silva Has Made Extraordinary Restitution</u>

Mr. Silva has already made extraordinary restitution that should hold significant weight when the Court fashions an appropriate sentence. Extraordinary restitution payments can justify a downward departure. *See* U.S.S.G. §§ 3E1.1, comment. (n.1), 5K2.0; *United States v. Kim*, 364 F.3d 1235 (11th Cir. 2004); *see also United States. v. Oligmueller*, 198 F.3d 669, 672 (8th Cir. 1999); *United States v. Bean*, 18 F.3d 1367, 1369 (7th Cir. 1994); *United States v. DeMonte*, 25 F.3d 343, 346 (6th Cir. 1994). Long before any criminal investigation began, Mr. Silva agreed to pay a civil monetary settlement of $150,000 in restitution for his wrongdoing, and agreed to the suspension of his fishing

license for 18 months. *See* Exhibit C (NOAA Settlement). He took out a home equity loan and was forced to sell both his boats as a result of the settlement.

After signing the NOAA settlement in July 2004, Mr. Silva had to sell the *Lutador I*, which he purchased in 1997, because he no longer had a fishing license and could not find a suitable captain for the boat. He also had to sell his second boat, the *Lutador II*, which he purchased in 2002, because immediately after the NOAA settlement, the bank mortgaging the *Lutador II* called the $490,000 note, which Mr. Silva had no way to repay unless he immediately sold the *Lutador II*. As a result, Mr. Silva was forced to sell his boat at a significant loss. He spent $680,000 to purchase and repair the *Lutador II* in 2002, but was forced to sell the boat for $500,000 in 2004 because of the time pressure to immediately repay the bank note. In addition, the fishing union sued Mr. Silva for selling his boat to a "non-union entity." Mr. Silva has placed $73,000 in escrow in order to settle this claim.

Extraordinary restitution can justify a departure to a sentence of probation. *See United States v. Kim*, 364 F.3d 1235, 1245 (11th Cir. 2004); *United States v. Davis*, 797 F.Supp. 672, 677 (N.D. Ind. 1992). In *Kim*, the court held that a payment of $280,000 restitution, which was agreed to *after* the indictment in the defendants' plea agreement, was extraordinary enough to justify a departure from a guideline range of 15 to 27 months to probation and home detention where the defendants, a husband and wife, dipped significantly into their life savings and voluntarily undertook an enormous amount of debt to pay the restitution. *Kim*, 364 F.3d at 1245. In *Davis*, the court departed from a guideline range of 24 to 30 months to a sentence of two years' probation with a condition of 7 months' community confinement, where defendant had agreed in a voluntary civil

settlement to pay $800,000 in restitution long before he was criminally indicted, and began making installment payments towards that amount. *Davis*, 797 F.Supp. at 677 (N.D. Ind. 1992). The defendant had borrowed a substantial sum in order to begin his payments and as of the date of sentencing, he owed only one additional installment of $25,000. *Id.* The court held that although Davis's restitution was not paid in full prior to the issuance of the indictment, his extraordinary amount of restitution warranted departure. *Id.* The court further held that based on the high amount of restitution, the logical and reasonable amount to depart was the *entire increase for the loss amount under the guidelines*, in other words, a departure of eight levels. *Id.*

Mr. Silva's circumstances are analogous to those in *Kim* and *Davis*. Mr. Silva has agreed to pay an even greater amount of restitution that that in *Kim* ($150,000 versus $140,000 in the case of each spouse) and, unlike in *Kim*, he did so long before he was aware of any criminal investigation or plea agreement. As in *Kim*, Mr. Silva had to deplete his savings and undertake significant debt in the form of a home equity loan to pay the NOAA restitution. With regards to *Davis*, Mr. Silva's circumstances are even more compelling in two respects. First, his adjusted gross income for 2003 prior to the indictment was approximately half that of Davis's $203,000 adjusted gross income in 1989, fourteen years earlier. *See Davis* at 678. And second, Mr. Silva's voluntary restitution settlement is *more than four times the loss amount assessed in the criminal case*, whereas Davis's civil restitution was equivalent to the calculated guideline loss amount. For these reasons, Mr. Silva requests that the Court depart by six levels, the level increase for the calculated guideline loss amount of $37,240.

Under the settlement terms, Mr. Silva was barred from fishing between July 2004 and January 2006. He immediately started up a fish wholesale business in August 2004 with his wife and two others, but despite his best efforts the business has not been profitable to this day. Nevertheless, through extraordinary financial hardship and without any income until April 2006, Mr. Silva has managed to make timely installment payments on his NOAA settlement and currently owes one more installment payment of $42,000. His current job as a crewman on a fishing boat which he secured in early April 2006, will enable him to support his family and save money to pay the final NOAA payment.

IV.     **The §3553(a) Factors as Applied to Mr. Silva**

A.      The Nature and Circumstances of the Offense and Mr. Silva's History and Characteristics

1.      *Mr. Silva's Good Character and Difficult Personal Circumstances*

Mr. Silva has strong family ties and a positive work history that should be taken into account by the Court. After growing up in a poor family in Portugal, Mr. Silva immigrated to the United States in 1973, when he was nineteen years old. He met his wife Maria and they married in 1975 and eventually had three children. When his children were still young, Mr. Silva left his family living in Newark, New Jersey to seek a job as a fisherman in New Bedford. He traveled back and forth from New Bedford and Newark for nine months and was separated from his family for much of that time, but through diligent work was able to secure a job as a cook on a boat and after saving sufficient funds, was finally to move his family to Massachusetts. For the past twenty-six years, Mr. Silva has worked extremely hard to support his family as a fisherman, first as a cook and deckhand on a boat and after many years finally buying his own boat in 1992 and employing his own

crew. Throughout that time, he has been on countless trips to sea, often leaving his family for days or up to two weeks and often in very bad weather, enduring harsh conditions to try his best to make a good catch to ensure his family and the families of his crew were supported. *See* Exhibit D *(*Letter of Danny Silva). As shown in his family's letters to the Court on his behalf, Mr. Silva is particularly close to his family and has worked to support them since the day he became a father. He has helped his children financially and morally, and now he has grown close to his grandchildren as well, spending time with them on a daily basis. *See* Exhibits D, E, F, G, H *(*Letters of Danny Silva, Maria Silva, Noel Silva, Jenny Pestana, and Alexandra Silva).

In addition, as evidenced in the letters from fellow fishermen and others in the industry many of whom have known him for twenty years or more, Mr. Silva has always acted as an honest and trustworthy businessman and has maintained excellent relationships with others in the fishing community. *See* Exhibits I, J, K, L, M, N, O (Letters of Jamie Santos, Armando Estudante, Antonio Afonso, Virginia Martins, Carlos Rafael, Carlos Vinagre, and Antonio Oliveira). He has helped other fishermen in small ways, for instance by offering to tow a boat during bad weather, and in large ways, such as by serving as the President of the United Fishermen's Club. *See* Exhibit J (Letter of Armando Estudante).

The letters offer many anecdotes of ways that with limited time and resources, Mr. Silva has been generous both with his time and financially. As President of the United Fishermen's Club, Mr. Silva helped local charities organize fundraisers at the club facilities, contributed with personal donations, and collected contributions from others. *See* Exhibit J (Letter of Armando Estudante). He has organized fundraisers for Portuguese American children and Portuguese orphans. *Id.* He organized a fundraiser attended by 700

13

people for a young woman on kidney dialysis. *See* Exhibit P (Letter of Diana Santos). He

has personally contributed at fundraisers and auctions, once bidding on an item and

returning it to bid on it again three times. *See* Exhibit I (Letter of Jamie Santos). He has

sent money back to his home town in Portugal to help pay for volunteer firefighters and

policemen. *See* Exhibit H (Letter of Alexandra Silva). He gave money to his son and

daughter-in-law for the down payment on their house, has lent money to people starting

their own businesses or when they were broke, and has volunteered with church projects.

*See* Exhibit H (Letter of Alexandra Silva).

       2.    *Mr. Silva's Offense*

         a.    <u>Description and circumstances of the offense</u>

     Although it is unclear that the area lobster population is in fact in need of serious

protection,[2] nevertheless Mr. Silva understands that as a participant in the fishing industry

he is bound to follow the established rules and regulations and he sincerely regrets that he

violated those regulations. Among other things, the regulations limit the number of trips a

vessel may make per year, and the amount and type of catches permitted on those trips.

As indicated in the letters from other fishermen, these detailed and rigid regulations must

be followed in the context of a harsh and unforgiving natural environment, where

dangerous and uncertain seas can often result in a completely unprofitable trip.

Simultaneously, the pressure on fishermen to have a successful catch on each trip in order

for their families to simply survive financially, is enormous.

     On the March 2004 trip at issue in this case, after spending a week moving further

and further out into deeper and more treacherous seas with almost no catch to show for it,

---

[2] *See Late Surge boosts Maine Lobster Catch*, Boston Globe, November 14, 2005, at B4; *Down East, the Lobster Hauls Are Up Big*, New York Times, May 31, 2001 (citing boom in lobster landings that are steadily rising to record heights in Maine).

Mr. Silva in the final days of the trip finally came across a large number of lobsters, which

he caught and kept in a desperate attempt to salvage the trip's profitability. Mr. Silva

admits that he used poor judgment in keeping the illegal lobsters, but he respectfully

requests that the Court consider the difficult circumstances surrounding his error. At the

point that the lobsters were harvested, Mr. Silva and his men had been at sea for over a

week, and he had been alternating working for nine hour shifts and then attempting to

sleep for three hours usually without success due to the frigid and turbulant conditions. He

had made no catch, and was tired and desperate by the time the boat came across the

lobsters, and he let emotion allow him to make a mistake.

Mr. Silva regrets that he disobeyed the rules, and fully acknowledges the illegality

of his conduct. Moreover, he is determined to strictly adhere to the rules and regulations if

he is fortunate to be able to continue working as a fisherman again.

b.    The calculated loss overstates the seriousness of the offense

The loss as calculated using the "retail" price of the lobsters overstates the

seriousness of Mr. Silva's offense. Where the guideline loss calculation yields a

significantly higher "loss" amount than the amount the defendant actually stood to gain,

the loss may overstate the seriousness of the offense, and a downward departure may be

warranted. *United States v. Stewart*, 22 F.3d 76, 82 (10th Cir. 1994); *see also* U.S.S.G. §

2B1.1, comment. (n.19(C)) (eff. Nov. 1, 2003)[3]. Mr. Silva did not gain any profit from the

March 2004 catch, as the entire catch was confiscated, including that which complied with

the regulations. The illegal lobsters were returned to sea, but notably, Mr. Silva was also

forced to give up the proceeds of the remaining legal catch sold at auction for $35,698.60,

further compounding his monetary punishment. Moreover, if Mr. Silva had sold the

---

[3] The application notes for U.S.S.G.§2B1.1 may not apply to Lacey Act violations.

15

lobsters, he would only have earned an "ex-vessel" price of $3.63 per pound, *not* the retail price of the lobster. *See* Defendant's Objections to the PSR at pgs 1-2. The legal lobsters at issue were in fact sold at the "ex-vessel" price of $3.63 per pound at auction on March 9, 2004. *See* Exhibit R (Bergie's Seafood sale receipt, 3/9/04).

In *Stewart*, the court held that the loss amount for stolen bonds was properly calculated under §2B1.1 as the market value of the bonds --in other words their face value-- for a loss amount of $129,000 and a nine-level enhancement, even though the defendant himself only stood to gain $0.20 per dollar for delivery of the bonds. *Stewart* 22 F.3d at 83. However, the court held that on remand, a downward departure could well be granted since "notwithstanding the proper application of the Guidelines, a nine-level enhancement under these circumstances may well overstate both the degree of Stuart's criminality and his need to be corrected." *Id.*

Similarly here, the amount that Mr. Silva stood to gain from the sale of lobsters at the "ex-vessel" price was significantly lower than the market price of the lobsters contemplated by the guidelines. Thus the guideline loss and six-point enhancement overstates the criminality of Mr. Silva's actions and a departure is warranted. Moreover, the calculated loss amount of $37,240 is at the low end of the range for a six-point enhancement, which is $30,000-$70,000. *See* U.S.S.G. § 2B1.1(b)(1)(D). Taking into account the significant difference between the "ex-vessel" and "retail" prices, the Court would be justified in applying at least a two-level departure so as to contemplate an "ex-vessel" value in the range of $10,000 to $30,000, which more accurately reflects what Mr. Silva stood to gain and the level his criminality.

In addition, at least one court has held that the amount paid in a civil settlement can offset the guideline loss amount. In *United States v. Gallegos*, 975 F.2d 710, 713 (10th Cir. 1992), the court held that where a defendant had already made a civil settlement with a bank for losses due to his false statements in a loan application, that civil settlement amount could offset the loss amount calculated under the guidelines in the criminal case. This case is analogous in that just as the bank was the only victim for purposes of the civil and criminal case in *Gallegos*, the victim in Mr. Silva's NOAA civil settlement is the same as the victim in the criminal case, that is, "the societal interest of maintaining sustainable levels of American lobsters in the Atlantic ocean." PSR at ¶ 27. Thus, the $150,000 civil settlement should offset, at least in part, the loss amount under the guidelines, especially given that the civil settlement is four times the "retail" loss amount.

Finally, in considering the seriousness of Mr. Silva's offense, the Court should consider that if he had been prosecuted under state law he would be subject only to fines for the first offense, and he would not be subject to imprisonment. *See* M.G.L.A. 130 § 41 (taking or selling female lobsters bearing eggs); 322 CMR 6.26 (2) (b) (lobster landing/possession limit). The only basis for Mr. Silva's Lacey Act prosecution is that he violated these state law provisions which themselves do not contemplate imprisonment. *See* Lacey Act 16 U.S.C. 3372 (a)(2)(A) ("it is unlawful for any person . . . to possess fish . . . in violation of any law or regulation of any State")). This disparity between state and federal sentences for the same offense is a basis for departure. *See United States v. Wilkerson*, 411 F.3d 1 (1st Cir. 2005) (where district judge had "expressed his concern about disparate treatment between federal and state court sentences in similar cases, but stated that the Guidelines did not permit him to take that disparity into

17

account . . .," case remanded for resentencing in part because under *Booker*, "the need to avoid unwarranted sentencing disparities" is among the factors to be considered by the now advisory Guidelines); *see also United States v. Barkiek*, 2005 WL 2334682, *6 (E.D.Va., 2005) (court departed from guideline range of 37 to 46 months to 18 months because conviction was based solely on a violation of state law, which if prosecuted in state court would be a misdemeanor carrying a maximum sentence of one year imprisonment).

c.    Minimal obstruction

Regarding the obstruction aspect of Mr. Silva's offense, the plea agreement contemplates a two-point increase for obstruction under U.S.S.G. § 3C1.1. Mr. Silva requests that the Court consider that the obstructive act --his simple denial that there were more lobsters down below, in response to the Coast Guard's query-- was at most minimally obstructive. Although Mr. Silva admits he was wrong to deny that there were more lobsters, his simple verbal denial can easily be characterized as an automatic response akin to a driver's automatic denial of knowledge that he was speeding when pulled over, rather than a deliberate and calculated effort to obstruct justice.

"A false statement made by a defendant to law enforcement officers cannot constitute an obstruction of justice unless the statement obstructs or impedes the investigation at issue significantly." *United States v. Manning*, 955 F.2d 770, 775 (1st Cir. 1992). Here, Mr. Silva's response to the Coast Guard officer denying that there were more lobsters down below did not significantly delay their investigation as the lobsters were discovered moments later. Courts have found that obstruction enhancements were not warranted in similar cases. *See, e.g., United States v. Fiala*, 929 F.2d 285, 289 (7th Cir.

18

1991) (no basis for two-level obstruction enhancement where defendant who possessed drugs in car, upon being asked by trooper during traffic stop whether he had anything illegal in car, responded that he did not); *United States v. Manning*, 955 F.2d at 775 (1st Cir. 1992) (obstruction enhancement not warranted where defendant used false identity in response to arresting officers' inquiries— since officers determined his true identity within several days of arrest, defendant's misstatement did not cause significant hindrance to investigation); *United States v. Solano-Godines*, 120 F.3d 957, 964 (9th Cir. 1997) (obstruction enhancement clearly erroneous where defendant provided false name and false identification documents to law enforcement-- court held that steps taken by law enforcement to determine identity including running computerized criminal history check, sending fingerprints to FBI and making three phone calls to prisons did not significantly hinder the investigation).  While Mr. Silva is not arguing that the two-level obstruction enhancement should not apply, the major point he wishes to make is that the obstruction here was not severe.

        3.    *Mr. Silva's Cooperation with the Government*

Mr. Silva's cooperation with the Government should also be considered as a mitigating factor.  A sentencing judge may take a defendant's cooperation with authorities into account pursuant to §3553(a), even though the Government has not made a motion pursuant to U.S.S.G. § 5K1.1.  *United States v. Fernandez*, 2006 WL 851670, at * 12 (2d Cir. 2006).  As described in more detail below, shortly after the civil investigation into this matter began, Mr. Silva signed a settlement agreement in which he agreed to pay a $150,000 fine and give up his fishing license for 18 months, which in turn forced him to take out a home equity loan and sell both of his boats.  Mr. Silva voluntarily agreed to

these terms long before he was aware of any criminal investigation against him. Once the criminal investigation was launched, Mr. Silva cooperated with the Government and accepted responsibility for his wrongdoing, resulting in a plea agreement.

Mr. Silva has also met with the Government twice, informally, to advise them as to how fish is delivered on the waterfront and to whom and for what purpose. While the information has not thus far resulted in a prosecution (nor has the Government agreed to file a departure motion), the information was of good general use to the Government and should be taken into account in this case. *See United States. v. Jaber*, 362 F.Supp.2d 365, 381 (D.Mass. 2005) (holding that four-level departure was warranted under §3553(a) in part because defendant made considerable efforts to cooperate with the government, even though he had little to offer and his information did not result in any prosecutions; court noted that defendant's cooperation indicated that he was less likely to recidivate).

B.    The Kinds of Sentences Available

Regardless of whether or not the Court grants a guideline departures for extraordinary restitution as argued for above, it is clear that the Court has discretion to sentence Mr. Silva to probation. Mr. Silva's offenses are Class D felonies, which means that imprisonment is not statutorily required. *See* 18 U.S.C. §3561 (a); PSR at ¶ 97. The sentencing guidelines range, before any guideline departure or §3553 (a) variance, is located in Zone D of the sentencing table. *See* U.S.S.G. §5A; PSR ¶ 98.    Under the pre-*Booker* regime, this would normally have mandated imprisonment. *See* U.S.S.G. §5C1.1 (f). Of course, if the Court chose to depart under the guideline departure ground of extraordinary restitution, the Court would have the discretion to impose probation even under a pre-*Booker* regime.

After *Booker*, however, the sentencing guidelines are not binding and the courts have discretion to impose split sentences, or sentences of probation, even when the defendant remains within Zone D of the sentencing table. Many courts have done precisely this. *See, e.g., United States v. Jaber*, 362 F.Supp.2d at 382 (varying from 57 to 71 month guideline range to impose two years' probation with six months' home detention under §3553(a) factors); *United States v. Jones*, 352 F. Supp. 2d 22, 25 (D. Maine 2005) (varying from guidelines to impose sentence of home detention despite fact that departure under guidelines not warranted).

Thus, a sentence of probation is available to the Court. Under §3553 (a), the Court must consider the availability of this option in determining the proper sentence in this case, regardless of whether or not it grants a departure under the guidelines. For the reasons discussed in Section VI below, such a sentence should be imposed because it constitutes one "sufficient but not greater than necessary" to achieve the statutory purposes of punishment.

C.    The Need to Avoid Sentencing Disparity

Under U.S.S.G. §3553(a)(6), in fashioning an appropriate sentence the Court must consider the need to avoid sentencing disparity. Recent sentences for a far greater degradation to the environment suggest probation is an appropriate sanction for Mr. Silva's much lesser violations.

On April 5, 2006, Judge Patti B. Saris sentenced Mani Singh, the chief engineer of an ocean-going containership, to 60 days imprisonment plus $3500 in fines and special assessments, for illegally discharging tons of oil sludge and oil-contaminated bilge waste into the ocean. *See* Electronic Clerk's Notes for proceedings (4/5/06) in case 05-cr-10274,

21

U.S.D.C. D. Mass; *see also* Govt.'s Sentencing Mem. at 5. Mr. Singh pled guilty to all five counts of the Indictment alleging that he permitted and directed the deliberate discharges of oil sludge and the falsification of official ship records designed to conceal his illegal conduct. *See* Indictment at 5-6.

In September 2005, U.S. Magistrate Judge Robert B. Collins sentenced Franklin Robert Hill, the tugboat operator responsible for the massive oil spill in Buzzards Bay in April 2003, to five months imprisonment. *See* Order (9/20/05) at 2 in case 05-cr-10111, U.S.D.C. D. Mass. Mr. Hill pled guilty to the Information alleging that he allowed his tug boat and the oil barge it was towing to veer out of the Buzzards Bay Channel and collide with a large rock outcropping. *See* Information at 8-10. As a result, tens of thousands of gallons of oil were released into the Bay, killing hundreds of birds many of which were protected species, forcing the immediate closure of thousands of acres of shellfish beds in Buzzards Bay, and devastating the region's fragile ecosystem. *Id.* Clean-up of the spill cost approximately $38 million. Govt.'s Sentencing Mem. at 3.

Mr. Silva's violation of the fishing regulations did not cause nearly the level of environmental devastation as did the defendants in these two cases. Comparing the level of Mr. Silva's criminality with these far more severe environmental violations, and especially in light of Mr. Silva's civil restitution, probation is an appropriate sanction in this case.

D.    The Need to Provide Restitution

Under §3553(a)(7), the Court must consider the need to provide restitution in fashioning an appropriate sentence. In order for Mr. Silva to continue providing restitution under the NOAA settlement, he has to earn a living. The only work that Mr.

Silva knows --and the work which will provide him with the most opportunity to earn sufficient wages to support his family as well as pay the civil settlement-- is fishing. As explained above, fishing requires the individual to be on a boat for trips at least overnight and often for days at a time. Therefore, traditional options such as community confinement and home detention would not work because Mr. Silva would not be able to come home every night— he would often be out at sea. Mr. Silva requests that the Court impose a sentence of probation to permit him to work on the boat of Mr. Perreira as a crewman. *See* Exhibit A (Letter of Firmino Perreira).

## VI.    The Minimally-Sufficient Sentence in this Case

As discussed above, *Booker* and 18 U.S.C. §3553 (a)'s parsimony provision imposes a statutory cap on sentences, no matter what is recommended under the sentencing guidelines: the sentence must be "sufficient, but not greater than necessary" to achieve the purposes of punishment. Here, it is respectfully submitted that a period of probation is sufficient to achieve the goals of punishment.

Justice is certainly served by this proposed sentence. A period of probation is substantial punishment for an individual who violated fishing industry regulations and has already suffered substantial punishment in the form of civil fines, and the loss of his license, his boats and his livelihood. In addition to constituting a just and substantial punishment in this case under the circumstances, a period of probation likewise achieves the goals of deterrence, incapacitation, and rehabilitation.

A.    A More Severe Sentence Will Not Achieve Greater Justice, Deterrence, Incapacitation, or Rehabilitation

In determining the minimally-sufficient sentence, the Court must essentially consider whether a more severe sentence would achieve greater justice, deterrence, incapacitation, or rehabilitation. In this case, it would not. In making this judgment, it is important to examine the ruination that Mr. Silva has already suffered as a result of his conduct and the resultant civil settlement and criminal prosecution. While these consequences are not a complete substitute for judicial punishment, they are critically important to assessing what further punishment is necessary in this case.

### 1. Just Punishment

In deciding whether to depart, the Court may consider whether the "collateral punishment" pursuant to a related civil prosecution partially satisfies the need for just punishment. *United States v. Redemann*, 295 F.Supp.2d 887, 897 (E.D. Wisc. 2003). As a result of his civil settlement with NOAA in this matter, Silva agreed to pay $150,000 in fines of which he still owes $42,000, lost his fishing license for 18 months, was forced to immediately sell both his boats with one selling at a significant loss, and his fishing business was completely ruined. Further, as a result of the civil and criminal prosecutions in this matter, Mr. Silva has been shunned by many fishermen in New Bedford who have expressed fear and reluctance to associate with someone who has "been caught" and whom the government "is watching." These fears have made it very difficult for Mr. Silva to find employment in the industry as other fishermen are concerned that their boat will be stopped and searched if Mr. Silva is on it.

In *Redemann*, the court departed downward two levels from a guideline range of 18 to 24 months since as a result of the defendant's civil prosecution he already had to pay $75,000, suffered adverse publicity in a small town, and ruined his business, so that "the

primary purposes of sentencing were partially achieved before the case was filed . . . and [the collateral punishment] partially satisfied the need for just punishment —district judges may consider such successive punishments . . . in deciding whether to depart." *Id.*; *see also United States v. Gaind*, 829 F.Supp. 669 (S.D.N.Y. 1993) (departure granted in part because destruction of defendant's business resulted in substantial loss of his assets and income and his inability to engage in similar or related activities, thus some of the objectives of sentencing including specific and general deterrence had already been achieved ). Given Mr. Silva's civil settlement and the attendant $150,000 fine, loss of his business and boats, and shunning by the fishing community, just punishment is certainly achieved by an additional period of probation.

     2.    *Recidivism is Unlikely*

     Deterrence and incapacitation are relatively minor considerations in this case given that Mr. Silva has lost his fishing vessels, his business, and his entire livelihood as a result of his mistake. In all reality, given the extraordinary difficulty Mr. Silva has had in securing a single low-paying offer for a position as a crewman in a fishing community that has shunned him, it is extremely unlikely that he will be able to secure the resources and connections to work as a captain ever again. In any case, Mr. Silva could not feel more regret for having made the mistakes that have placed his family in such a precarious financial situation and he has vowed to follow every rule and regulation scrupulously no matter in what capacity he is ever able to work in the industry again.

     Moreover, at almost 53 years old, Mr. Silva's age makes recidivism unlikely. "Post-Booker courts have noted that recidivism is markedly lower for older defendants." *United States v. Lucania*, 379 F.Supp.2d 288, 297 (E.D.N.Y. 2005). Studies show that

defendants "over the age of forty . . . exhibit markedly lower rates of recidivism in comparison to younger defendants." *See Measuring Recidivism:  The Criminal History Computation of the Federal Sentencing Guidelines*, at p. 28 (2004) www.ussc.gov/publicat/Recidivism_General.pdf (stating that for those defendants in Criminal History Category I, the recidivism rate for defendants who are over 50 is 6.2 percent (and for such defendants ages 41 to 50 the rate is 6.9 percent), whereas the recidivism rate for such defendants between the ages of 31 and 40 is greater than 12 percent).  Courts have departed on this basis. *See e.g.*, *United States v. Carmona-Rodriguez*, 2005 WL 840464, *4 (S.D.N.Y. April 11, 2005) (granting departure below guideline range "in view of the low probability that [defendant] will recidivate" at age 55); *Simon v. United States,* 361 F.Supp.2d 35, 48 (E.D.N.Y. 2005) (granting departure from range of 324 to 405 months, to 262 months for 42 year old defendant because "the Guidelines fail to consider that recidivism drastically declines with the defendant's age" and "the Guidelines' failure to account for this phenomenon renders it an imperfect measure of how well a sentence protects the public from further crimes of the defendant").

Mr. Silva's age has further relevance to sentencing in that where a defendant has not been convicted of a criminal offense until later in life, a departure under §3553(a) is warranted. *United States v. Ward*, 814 F.Supp. 23, 24 (E.D.Va. 1993).  In *Ward*, the court held that a departure was warranted because defendant was 49 years old and his PSR showed "no juvenile or adult criminal convictions for the purposes of his guideline sentence calculations." *Id.*  The court held that although the guidelines do "not account for the length of time a particular defendant refrains from criminal conduct . . . the length of time a person refrains from the commission of crimes, which is invariably tied to a person's

age, is a [§3553(a)] factor that is critical to a court's determination of the sentence it should impose." *Id.* Mr. Silva respectfully requests that the Court depart in this case because he will be 53 years old by the time of sentencing, and he has never before been convicted of a crime.

3.    *Rehabilitation*

Finally, Mr. Silva's need for rehabilitation, while slight compared to many offenders, is met by the proposed sentence. Mr. Silva let a difficult situation at sea get the better of his judgment, and he regrets his violation of the rules and regulations. The proposed sentence will further solidify Mr. Silva's respect for the law.

4.    *Probation will Enable Mr. Silva to Pay Restitution*

Finally, where the guidelines contemplate a prison sentence, the Court may impose probation so as to "afford Defendants more time to pay restitution." *U.S. v. Coleman*, 370 F.Supp.2d 611 (S.D. Ohio 2005) (departing from 6 to 12 months to probation and house arrest). A term of probation will provide significant punishment while also permitting Mr. Silva to continue to earn a living as a fisherman so that he can promptly pay the remaining $42,000 restitution remaining in his $150,000 civil fine.

## VIII.  Fine

Imposition of a fine is discretionary, and, Mr. Silva respectfully submits, should not be ordered in this case. Mr. Silva's financial condition is such that he is currently unable to pay any significant fine, and is not likely to be able to do so in the foreseeable future. *See* PSR at ¶¶ 91-95 (financial condition); U.S.S.G. § 5E1.2(a) (fine not recommended if defendant unable to pay). Moreover, Mr. Silva continues to have substantial financial

liability in the form of the civil penalty of which he still owes $42,000 by December 2007, and Mr. Silva has placed $73,000 in escrow for likely payment to the fishing union as a result of their civil suit against Mr. Silva for selling his boat to a non-union entity. *See* U.S.S.G. § 5E1.2(d) (in determining the fine amount, the court shall consider restitution and civil obligations arising from defendant's conduct).

## VIII.  Conclusion

Mr. Silva respectfully requests that the Court grant a departure based on the guideline and §3553(a) factors argued above. Even if the Court finds that none of the guideline or 3553(a) factors argued above taken alone justifies a departure, it may depart based on the aggregation of those factors. *U.S. v. Coleman*, 188 F.3d 354, 360 (6th Cir. 1999) (en banc); *see also U.S. v. Broderson*, 67 F.3d 452, 458-49 (2d. Cir. 1995) (aggregation of factors including that the loss overstates the seriousness of the offense and restitution was paid, justified a departure even though no individual factor did). The totality of the circumstances warrants a departure to a period of probation.

Mr. Silva has lost everything he had built through a lifetime of entrepreneurship and hard work despite coming from a poor immigrant family, and having only a fourth grade education. His fishing vessels, which he worked his entire life in order to own, are gone. His savings are gone. The small business he attempted is failing and has produced no profit. He has no health insurance or retirement savings. Mr. Silva supports his wife and she will suffer tremendously both personally and financially if he is incarcerated, as she is 52 years old and has only a fifth grade education and no marketable skills. At 53, Mr. Silva is an old man in the eyes of the fishing industry because the job –especially as a

low-level crew member-- requires physical vigor and ability to endure harsh conditions. As Mr. Silva ages, performing such a job will be increasingly difficult, but he will be forced to find any employment he can, because he has no other income or savings and fishing is all he knows.   Mr. Silva recognizes that he has brought much of this upon himself, but the punishment is no less real for being self-inflicted, and that is what matters in asserting the need for additional judicial punishment.

Respectfully submitted,

/s/ Laurie C. Carafone
_____

Michael A. Collora (BBO No. 092940)
Laurie C. Carafone  (BBO No. 656399)
Dwyer & Collora, LLP
600 Atlantic Avenue
Boston, MA 02210
(617) 371-1000

Dated:   April 10, 2006

## CERTIFICATE OF SERVICE

I, Laurie C. Carafone, hereby certify that a true and correct copy of this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as nonregistered participants on April 10, 2006.

/s/ Laurie C. Carafone
_____

Laurie C. Carafone

29

EXHIBIT A

April 4, 2004

Dear Honorable Judge O'Toole,

    I Firmino Perreira owner/captain of F/V Cowboy would like to submit this letter of interest to employ Jose Silva.

    I average seven to nine days on a regular fishing trip on my vessel. Due to inclement weather and fishing regulations I sometimes cannot control my schedule.

    I would like to employ Jose Silva if you will allow him to work on these terms if you sentence him with community confinement.

Sincerely,

EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| United States of America | ) | |
| | ) | |
| v. | ) | Docket # 1:05-cr- 10011 GAO-1 |
| | ) | |
| Jose Silva | ) | |

## AFFIDAVIT OF KEVIN FERREIRA

I, Kevin J. Ferreira, hereby state and declare as follows:

1.    I, Kevin Ferreira, submit this affidavit in connection with sentencing in the above-captioned criminal matter.

2.    I am a professional Seafood Industry consultant, and I have been licensed federally and by the Commonwealth of Massachusetts with various companies, including retail companies, since 1980.

3.    I am the owner of Seafood Consulting and Analysis, Inc., a consulting firm and wholesale seafood dealer located at 50-62 Hassey Street, New Bedford, Massachusetts, 02740.  I have been the owner since the company was incorporated in 1997.

4.    I have been in the lobster dealing business since 1980.

5.    I have personal and professional knowledge that, during the period from 2000-2004, the industry standard mark-up for live lobsters from the "ex-vessel" price to the "wholesale" price was (and still is) approximately $0.25/lb.  Sometimes, but not often, wholesalers would go beyond the industry standard and mark-up the price as much as $0.50/lb.  However, the mark-up was never as high as $1.00/lb.

6.     I have personal and professional knowledge that, during the period from 2000-2004, the industry standard mark-up for the "retail" price of lobsters was between 30% and 40% above the "wholesale" price.

7.     Thus, for example, according to industry standard practice during the period from 2000-2004, if a vessel caught lobsters and sold them for the "ex-vessel" price of $4.50/lb., the "wholesale" price for those lobsters would be $4.75/lb., and the "retail" price (assuming a 30% mark-up) would be $6.18/lb.

8.     The above-described mark-ups remain generally the industry standard to this day.

9.     However, from 2000-2004 (as is true today), in many transactions, the industry standard mark-up was not obtained at either the "wholesale" or the "retail" level. During poor market conditions, lobsters were often sold at a loss and the price mark-ups were much less for "wholesale" and "retail" than the standard mark-ups described above. Thus, the "wholesale" and "retail" prices were often much closer to the "ex-vessel" price.

10.     Also, the "retail" mark-up of 30-40% above the "wholesale" price is not a true mark-up of the price of all of the lobsters in the catch. In reality, this high mark-up for retail is in order to compensate for a 10-20% death rate of the lobsters sold to the retailer.

11.     Based on my professional knowledge, normally during the spring months, especially in March, the percentage of female egg-bearing lobsters in each catch is at or near its peak. However, during the rest of the year, the percentage of female egg-bearing lobsters in each catch is much lower, at a level half or less of that in the spring months.

Signed this 29th day of March, 2006 under the pains and penalties of perjury.

_Kevin J. Ferreira_
Kevin Ferreira

EXHIBIT C

FROM NOAA/GCNE

(THU) 7  1'04 14 16/ST 14'15/NO. 186 157:17 P  1



**U.S. DEPARTMENT OF COMMERCE**
National Oceanic and Atmospheric
Administration
Office of General Counsel/Northeast Region
One Blackburn Drive
Gloucester, MA 01930-2298
Phone: 978-281-9240  Fax: 978-281-9389

F/V Lutador II -  NE042011PM/V

## TO SETTLE THE CASE NOW COMPLETE THE FOLLOWING:

In settlement of the violations of the Atlantic Coastal Fisheries Cooperative Management Act, as alleged in the Notice of Violation and Assessment (NOVA) and the Notice of Permit Sanction (NOPS), Avciro Corp. and Jose Silva, the Respondents, and the National Oceanic and Atmospheric Administration, United States Department of Commerce (NOAA), do hereby stipulate and agree as follows:

1. Respondents do not admit the violations alleged in the NOVA and NOPS, but agree not to contest the matter and waive their right to a hearing.

2. Respondents agree to pay to the "Dept. of Commerce/NOAA" a compromise civil penalty of $150,000 (plus 1% simple annual interest, on any balance outstanding after September 1, 2004) as follows: $25,000 on or before September 1, 2004, $42,000 on or before June 1, 2005, $42,000 on or before March 1, 2006, and $42,000 on or before December 1, 2007. Respondents agree to sell the F/V Lutador II, in an arm's length transaction to an independent party, within six (6) months from the effective date of this agreement. For a period of three (3) years, commencing on the effective date of this agreement, the Respondents shall refrain from applying for, and shall be ineligible to receive, any federal fisheries vessel permits. Further, Respondent Jose Silva hereby agrees to give up his federal operator permit, and to refrain from all commercial fishing as a Master or crewman, for eighteen consecutive months, commencing on July1, 2004. Respondent Jose Silva's operator permit must be turned in to the NOAA Office of Law Enforcement in New Bedford, Massachusetts while the operator permit sanction is being served.

3. In addition, the Respondents hereby forfeit and relinquish all right, title, and interest in and to the proceeds ($35,698.60) from the sale of lobsters and fish seized from the F/V Lutador II on or about March 7, 2004. Respondents also forfeit and relinquish all right, title, and interest in and to the 2,002 pounds of lobsters which were taken from the F/V Lutador II and returned, alive, to the sea on or about March 8, 2004, by enforcement personnel.

4. NOAA shall accept Respondents' payments, service of permit sanction time, and forfeiture of the seized lobsters and proceeds and as full settlement of all claims, charges, and complaints by NOAA arising from the violations described in the NOTICE. Furthermore, these violations shall constitute prior offenses in NOAA's future consideration of any penalty to be assessed against the Respondents or in any permit sanction to be imposed on the Respondents.

(FRI) 7. 9'04 10:53/ST. 10:51/NO. 4861157152 P. 2

FROM NOAA/GCNE

FROM NOAA/GCNE                                                    (THU) 7.  1'04 14 14/ST 14:15/NO 4861137:.7 F  2

5. Seven days after the Respondents' receipt of written notice of a failure to pay the compromise civil penalty and failure to cure the deficiency, the originally assessed penalty ($663,000) shall become a final judgment, NOAA shall commence a collection action for the full amount of the civil penalty ($663,000) charged in the NOTICE, and any Federal fishing permits issued to the Respondents shall be immediately revoked.

6. Respondents agree that all rights of appeal are hereby waived and that Respondents shall bear their own fees and other expenses incurred by them in connection with any of the proceedings pertaining to these matters.

7. Respondents acknowledge that the provisions of this Agreement and the legal effects thereof have been explained to them, and they are entering into this Agreement freely and voluntarily, without coercion, duress, or undue influence.

8. The obligations set forth in this Agreement are severable and independent of one another in that the breach of one provision does not (unless expressly stated otherwise) extinguish any duties and rights set forth in any other provision of the Agreement.  It is the intent of the parties that if it is determined that any portion of the Agreement is declared invalid, all other provisions shall remain in effect.

9. This Settlement Agreement is effective as of the date it is signed by the both the Respondents or their representative(s) and the National Oceanic and Atmospheric Administration

ON BEHALF OF Aveiro Corp.:

_____                                    7/1/04
Respondent or Authorized Representative.                   _____
                                                              Date

ON BEHALF OF Jose Silva:

_____                                    7/1/04
Respondent or Authorized Representative                    _____
                                                              Date

ON BEHALF OF THE NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION:

_____                                    7/1/04
Charles R. Juliand                                         _____
Senior Enforcement Attorney                                   Date

COMMONWEALTH OF MASSACHUSETTS
DIVISION OF MARINE FISHERIES

SUFFOLK, SS.
ADJUDICATORY PROCEEDING
DOCKET NO. OSL-17-04-PH

IN RE JOSE SILVA, and       )
OFFSHORE LOBSTER            )
PERMITS NO. 3384 and        )
2187                        )

SETTLEMENT AGREEMENT

Jose Silva, Aveiro Corporation, Silva Fishing Corporation (the "Defendants") and the Massachusetts Environmental Police do hereby agree to stipulate and settle the above civil matter as follows:

1) Offshore Lobster Permit Number 3384, held by the F/V Lutador II by Aveiro Corporation, 113 Mac Arthur Blvd., New Bedford, Ma. is hereby revoked and surrendered to the Massachusetts Environmental Police and will not be reissued.

2) Offshore Lobster Permit Number 2187, held by the F/V Lutador by Silva Fishing Corporation, 113 Mac Arthur Blvd., New Bedford, Ma. will be surrendered to the Massachusetts Environmental Police and replaced with a "Boat License-60-99 feet" (322 CMR 7.01(2)(d)). Said license is restricted from the landing of lobsters, and the Offshore Lobster Permit Number 2187 will not be reissued for a period of five years from the date of signing.

3) Neither any of the Defendants nor any current or future officer, director, manager or agent of the Aveiro Corporation or the Silva Fishing Corporation may hold any lobster license issued by the Mass. Division of Marine Fisheries for a period of five years from the signing of this agreement.

_____          For Aveiro Corporation:
Jose Silva                       _____
                                 Authorized Representative
For Silva Fishing Corporation:
                                 For Mass. Environmental Police
_____
Authorized Representative        _____
Dated: July 15, 2004             Authorized Representative

EXHIBIT D

3/21/06

Dear Judge O'Toole

My name is Danny Silva I am Jose Silva's oldest son. My Father has been a Fisherman Pretty much all my life. It hasn't been easy growing up as a Fisherman's kid. I pretty much grew up without a Father my Father Has never been thier for me growing up not because He didn't want too but because the Job wouldn't let him. Nobody Knows what a Fisherman's life is really like unless you experience it for you're self. My Father worked his hard his whole life to succeed for himself and Mostly for his family my Father grew up very poor and for my father to reach the level that he was at is a very big accomplishment and because one mistake that he did He lost everything he's ever worked for is gone it's hard for me To see My Father at This point of his life it would be for any kid I don't Think it's fair That They Take everything he's worked for then put him in Jail I just don't Think he deserves this my father didn't kill, or rob a bank my father was Just trying to earn a living. I know what it's like I'm a Fisherman's

Son and I ~~was taught~~ Know I'm a fisherman my self and I've
been doing it since I was a kid. I'm ~~29 years old~~ ~~husban~~
married with Two beautiful children I've worked
with my dad all my life and it wasn't easy I never
Thought I would be a fisherman but I grew into
it. It's a very difficult Job you experience
a lot of diffrent Things it's hard physically and
mentally and most of all it's hard for every fisherman
with a family to get on a fishing boat and getting
ready to set SAil out to sea as soon as we pass
The barrier doors we hope we come home safely
to our family's ~~and That's it~~ but we sacrifice to make
a decent paycheck to give our family a good life and
That was Something I didn't ~~understand it~~ before
and it's something no one will unless you experiance
it as a fisherman it's rated #1 most dangerous Job
in the world and know I understand why it's
The ~~rough~~ weather the hard work and sometimes tolerating
people That you're Force to work and The hardest
part leaving you're family behind for weeks at ~~a~~ a
time. I grew up very angry at my dad for that
and now as an adult, Husband, and Father. I love and
appreciate my dad for ~~that~~ everything he's done for my mom and siblings
and I'm greatful for everything he's taught me. Judge
O'Toole I Just don't think he deserves everything they

Trying to do to him he lost everything he's worked for plus lost a lot of his Friends thier are a lot of things I can write but it's hard for me to explain it in writing I did the best I could to at least give you a brief Idea. ~~only~~ I hope you make the wright decision not because I'm his son but because you can try to understand my dad's life as a fisherman/Dad

Sincerely
Danny Sil

EXHIBIT E

Honorable George A. O'Toole
United States District Court
One Courthouse Way
Boston, Ma 02210

Dear Judge O'Toole

My name is Maria Silva and I am Jose Silva's wife of 31 years. I have known my husband for 34 years and know him to be the most caring and compassionate man I have ever known. He is a dedicated husband and wonderful father and grandfather, and I can't imagine my life with out him.

Twenty-seven years ago he decided to go into the fishing business and move to New Bedford. He decided he wanted to become a fisherman so I could stay home and raise our two kids at that time. At first I did not like the idea but I knew that it would be best for my family, and that Jose was willing to sacrifice himself for us.

Your honor my husband has always been the type of person that would give the shirt of his back and not ask for anything in return. I believe this was the case with his fishing business and crew. He would do anything to help his crew members and their families. He would always pray and hope to bring a home a decent pay check for his crew members and himself. This may have been the reason behind my husband making such a wrong choice. He is not a selfish man but a concerned human being that wants the best for everyone.

My husband has suffered much both financially and spiritually. Seeing him suffer has taken an emotional toll on myself and on my children. He has lost his boats, his crew, his business attachments and now all he has is myself and our family. The idea of him having to go to jail and be punished some more is beyond words. I cant picture myself with out him and seeing myself at age 52 looking for work and trying to support our bills and household all by myself. I beg of you to please take all of this into consideration and I ask you to please give me my husband minimum punishment that would not require to take my husband, bestfriend, my only love away from me. God knows he is what keeps me going, and to see him suffer these past two years to try to remain strong for him and support him has been very challenging but to just see it all go down the drain and get punished even more would be heart wrenching. When you make your final decision, please remember everything and that my husband is a "good man".

Sincerely

Maria C. Silva

Maria Silva

EXHIBIT F

Honorable George A. O'Toole
United States District Court
One Courthouse Way
Boston, Ma 02210

Dear Judge O'Toole

 Let me introduce myself, I am Noel Silva twenty-one years old, the youngest son of Jose Silva. I'm a full time mortgage broker at AmeriFi, a mortgage company based out of Johnston, RI.

 Your next question your honor might be, where exactly do I fall in the picture? I still live at home with my parents. I'm the last one here so more than my brother and sister I have seen the extent of what this trial has brought to my family and father. Never as much have I seen my mother and father argue about money as they do now, my fathers business? Sold to pay for lawyers fees and to help pay for the bills and to help keep my father stable until he can get back on his feet. May I add your honor he still is not back on his feet. My father is 51 years old your honor rather than looking forward to retiring in the next 10 yrs my father is starting from scratch again to build himself back up. I understand your honor there must be consequences for every action, but has he not been punished enough? The only people who will suffer from further punishment your honor will not be Jose it will be his family, his sons, daughter, grandchildren, and most of all, his wife, my mother.

 I beg you your honor please do not keep Jose from watching his grandchildren grow right in front of him anymore, or keep him from picking me up every time I fall flat on my face. Which happens more times than I'd like. I hear a lot of my friends tell me there father wasn't there for them, or never really cared. That was never the case with my father your honor he has always been there for me morally, financially, and just when I need talking to, or someone to talk to myself. He's always there to give me advice, my father is truly my best friend your honor. About six months ago my girlfriend who I have been dating for over two years now was thrown out of her house your honor not because of her actions, but because of her mother's boyfriend, not wanting her around. My father has given her a roof to put over head and treats her as if she were his own daughter. Because of my father my girlfriend, Kelly, was given the opportunity to finish college and now attends Bridgewater State College and is working hard to make something of her self. She's currently studying to be a social worker. If my father never gave her a place she would be homeless and a college dropout.

 Every morning I wake up your honor, walk upstairs and see my parents having their usual toast with coffee. My niece Jacquelyn, or my nephew Nicholas sitting on my fathers lap. It brings joy to me to be able to walk up there see my father playing with one of the grandchildren give my dad the usual morning hug, my mom the kiss on the cheek, and have his morning motivational speech on work ethics and to always be respectful and keep my head up. Please your honor, don't take my father, and my best friend from me. With out my father in my life for direction and help your honor I do not know where I

would be today. Please let my father put all this behind him and move on in his life, he has suffered enough and in the end so has the family.

Sincerely,

Noel Silva

EXHIBIT G

Jenny Pestana
126 Norman Street
New Bedford, MA 02744


The Honorable George A. O'Toole
US Court House
1 Court House Way
Boston, MA 02210

Dear Honorable O'Toole:

My name is Jenny Pestana and I am writing on behalf of my father, Jose Silva. I am Jose Silva's only daughter. I would describe my father as having a tremendous kind heart with everyone not just his family. My father has always been there whenever I have needed him, both financially and emotionally. My father for as long as I can remember has always been a good provider for our family, not to mention to his former employees and their families.

As I have become older, I have come to understand the sacrifices my father did for us. Due to the nature of my father's job, which over time became his career and his passion, we did not have the opportunity to spend as much time with him as other children who have parents that have a job from 9 to 5, so when my father came in from fishing, we would treasure the time we did spend with him. As far as I can remember, my father has always been a fisherman. This is a job that is dangerous and takes up a great deal of his time. He chose this career to make a better life for his family and to provide us with the necessities of life. My father was not one to spoil any of his children, so when I say necessities, I mean food, clothing, and a roof over our heads.

There were times when my father could not participate in special events in our lives but he always made sure we had everything we needed when he was not able to be there. When he was home from fishing, we would be so excited to see him, and spend time with him, because we knew that he would have to leave soon, therefore, whatever time we spent with him was precious to all of us. After a while, my father would be able to try to, at least, try to arrange the fishing schedule so that he would attend, for example, our graduations from high school.

If it was not for my dad, I would not be where I am today. After graduation, my father helped me with my cosmetology program. I now have my cosmetology license and I am an instructor for a local school. It is a profession that I enjoy and that I am proud of. I have learned from both my parents, but especially my dad, to enjoy what you do and do it well.

My father has also helped me with difficult situations in my life. Another example was my wedding, even though I had the capability of paying my own way, my dad was there for me and helped me arrange for the most important day in my life to be perfect. Thanks to him, it is one of the most memorable days of my life. When my daughter was baptized, he again helped both my husband and I celebrate her baptism in a beautiful way, another perfect occasion thanks to both my parents, but especially my dad who always finds a way to help and never ask for anything in return. I know have another child, my son, Austin, who enjoys spending time with his grandfather. He spends time with my children when it was impossible for him to spend time with his own children.

I want my children to have the opportunity to spend the valuable time with their grandfather that was taken away from us because he was providing for us, and in doing so, we missed so much time that normal families take for granted.

Even after everything my father has been put through in these last three years, he has managed to still believe in people and still continues to help without asking for anything in return. My father has been painted a "bad guy" and I feel unjustly so. He understands what he did was wrong and has paid tremendously for his mistake. He has paid both financially in the form of fines and in the loss of the respect in our community. He has, however, never lost the respect of any of his children or his wife. He has managed to hold his head high and try to continue with his life as best as possible, and he has done a tremendous job. I could not have done what my father has done in the last three years. He has managed to continue to provide for his family. He has also managed to help a family that needed a home amongst other things. He helped this family by letting them stay in his home and providing for their necessities as much as he could. He has been forced to start a new life at the age of 52. How many people can say that they are starting a new career at age 52 instead of retiring? If there is anything positive that I can get from this whole mess it would be that I have been able to spend the much needed and valuable time that my brothers and I missed as children with my dad.

Sincerely,

Jenny Pestana

Honorable George A. O'Toole
United States District Court
One Courthouse Way.
Boston, Ma. 02210


Dear Honorable Judge George A. O'Toole,

My name is Brian Da Silva, I am 25 years old and I am Jose Silva's nephew and godson. All of my life, I've known Jose to be a respectful, kind, and caring gentleman. He is one of the strongest people I know, and I am proud to say that he is my godfather. I feel extremely lucky to have been brought up with a mentor with his qualities. I've learned a lot from being around him. His work ethics, respect for family and the motivation for working towards my dreams, have all transpired into my adulthood through being brought up around him. I love him for the person he is and the love he has shown towards my family. This man has been there for my family in good times and bad.

I ask you, your Honor, to please hear my plead for a minimum punishment that would not require this man to be taken away from his family, who needs him to provide for them. Given the circumstances, I feel as though my uncle is being placed in a category of people who have committed crimes far more deeming to society than that of which my uncle is accused. To place him in jail, side by side with figures far more violent than my uncle, would simply be wrong.

Jose Silva is a compassionate man who spent his entire adult life defying dangerous conditions on the sea to provide a comfortable living situation for his family. I realize that the accusations which my uncle is under scrutiny for are severe infractions with regards to the fishing industry's regulations, but to place him in the company of those who have done our society harm would be devastating to this man who has done so much for those around him.

His right to fish has already been stripped from him. He was forced to sell his fishing vessels in order to pay for his outrageous fines imposed on him by the government, crippling him financially. This alone seems to be punishment enough. To take this man's livelihood away, has caused more pain and anguish than anyone could imagine.

Although I am not aware of the many details that have gone into this investigation, it seems as though the Officials handling this case are being rather harsh towards my uncle. As I have stated earlier, I realize that what he did was wrong, but can a man really be looked at as a criminal when all he is trying to do is provide a strong backbone to the future of his children and grandchildren. The Officials have already stripped my uncle of the things he knows best, but worse, of his dignity.

It is common for those of us with normal nine to five jobs to think of fisherman as simply men who wear raincoats and catch fish, but the reality of it is that every time these boats set out into the vast ocean, they are never promised a safe return. If it is wrong for someone to try and do a little more for their families, then maybe we all should look at who we are.

I am confident that the Justice System in the State of Massachusetts will find the correct verdict for this case. I simply ask for a fair trial and that you show mercy on behalf of my uncle.

Sincerely,
Brian Da Silva

Brian Da Silva
4/20/06

EXHIBIT H

March 1, 2006

Honorable George A. O' Toole
United States District Court
One Courthouse Way
Boston, Ma 02210

Dear Judge O'Toole

As way of introduction, I am Alexandra Silva, married, mother of two children Jacqueline and Nicholas. I work full time as a vocational rehabilitation counselor and am also a student pursuing my Master's in Counseling. I met Jose Silva in 1994 when I started dating his son Danny, now my husband.

For twelve years this man has always made me feel welcomed and part of his family. In 2000 I married his son and truly felt like I had a father in my life. This man not only supported us financial but also emotionally when we where first starting off in our married life. He always made me feel like I had someone to turn to in case I ever had a problem. I personally have never felt this same way with my own mother or family.

In 2002 my intermediate family started to grow and my little apartment that I rented with my husband was not big enough for a baby. So off we went home searching, Jose and his wife would often come along on our home searches and give us their opinion and support. We soon found our first home but needed money to put down and some money to fix it up. We had some savings from working but that was not enough so my husband and I decided to ask my father in law Jose for help. He automatically gave us some money to put towards the down payment on the house and also lent us money to fix up the home with no deadlines to pay him back. I will always be grateful and will never forget this because this is the place that I share my most precious family moments and where both of my children grow and rest there heads at night.

I was raised without a father due to my father passing away when I was six months old and my mother never remarrying. In April of 2003 my daughter Jacqueline was born and shortly after my maternity leave I had to return to work. My mother in law would watch my daughter every week while I was at work and my father in law would help out when he was home from fishing. He would play with Jackie, feed her, give her snacks and a lot of times go with my mother in law to the wharf to show her his boats. This relationship has grown over the years and has become very strong to the point that there isn't one day that my daughter does not talk about her grandfather or even draw him in her pictures. My son Nicholas was born in February of 2005 soon again both my mother in law and father in law Jose started caring for my son when I went back to work. My son cannot get enough of his grandfather. Jose plays with him, feeds him, and even changes his diapers. As long as Jose is home my son will not leave his side. I believe that my children feel this way because he is caring, gentle, kind, and patient. Jose is the only grandfather they know and I am proud to say that he is an exemplary grandfather figure. My children not only see him as a grandpa but as a best friend.

These are just some of the examples of good deeds Jose has done but there are many more. Jose as I have mentioned is my father in law and I am related to him by marriage but I would like to mention that even though there is a relation my judgment of his character is very high. He always been a very hard worker and he always tried to provide the best for his family. I believe Jose to be a kind, generous, supportive, lovable, patient, and forgiving man towards his family and friends. Outside of helping out his family that I have knowledge of he not only has been involved in a variety of public fund raisers but has also been involved raising money for people with cancer and various other diseases, financially contributions to clubs, lending money to people to start up businesses or when they were broke, helping church organizations with special projects, even sending money to his hometown in Portugal to help pay for the volunteer firefighters and policeman. This is the type of man I see everyday so I ask you to please help him and keep these good deeds in mind when considering his sentence.

Jose has suffered tremendously as this case progressed. I hope in your heart you can give him a chance in a way that will not make my family and children suffer and that will not make him suffer even more.

Sincerely,

Alexandra Silva

EXHIBIT I

The Honorable George A. O'Toole
U S Court House
1 Courthouse Way
Boston, MA 02210          03-24-06

Dear Judge O'Toole,

I am writing this letter on behalf of Mr. Jose Silva.

My name is Jamie S. Santos. I own the F/V Lady of Grace, fishing out of New Bedford. I have been in the fishing industry for over 25 years.

I met Mr. Silva during everyday fishing business and I have found him to be a very hard working individual. Mr. Silva is an honorable and decent man. He puts his family, friends, and crewmembers before himself.

We have participated in fundraisers together. Being in a working capacity or by giving donations. On one such occasion, at Europa Restaurant, Mr. Silva bid on an auction item then returned it to be auctioned off again. He bid on this item three times. This is just a small example of the caring person he is.

Mr. Silva is truly remorseful for his actions and has payed for his mistake by loosing his business, which is his livelihood. I ask that you please take this into consideration at sentencing.


Respectfully yours,

Jamie S. Santos

EXHIBIT J

March 11, 2006
The Honorable George O'Toole
United States District Court
One Courthouse Way
Boston. MA 02210

Dear Judge O'Toole,

I am a fisherman and boat owner from New Bedford, MA.
Please accept this letter on behalf of Jose Silva.
I met Jose 27 years ago when we both started fishing in New Bedford.
Through hard work and honesty he made his way up from deckhand to captain and boat owner.
Jose always was helpful to his fellow fishermen.
To this day, Jose is known in the community for always donating fish to individual retired fishermen and fishermen widows and children.
In 1996 my boat Lucisaura had a breakdown offshore and had to be towed into port. Jose had just arrived to New Bedford from a fishing trip and volunteered to go right back out in bad weather with his boat and tow mine. He did this for good will.
In 2001 Jose took time off from running his boat to be president of the United Fishermen's Club. For one year he made it his full time job to manage the club and he brought it from near bankruptcy to sound financial shape.
During his presidency, Jose helped local and Portuguese charities by donating the club facilities for fundraisers, by contributing himself with personal donations and time to organize functions and by obtaining cash and time contributions from other members of the community.
He organized fundraisers for the Portuguese American children of immigrants from the Portuguese township of Ilhavo, for the Casa do Gaiato, a Portuguese orphanage and for the Cancer Foundation.
I believe that Jose is a man of his word with a good hearth that has made many good deeds through his life. He has suffered very much emotionally and financially through this case. I hope you find a way of giving Jose a chance to rebuild his life and continue to contribute to the wellbeing of those around him while he is young.

Sincerely,

Armando Estudante

EXHIBIT K

Antonio Afonso
1511 N. Hixville Rd
N. Dartmouth, MA 02747
Tel. 508-676-8850
e-mail mafonso@comcast.net


March 9, 2006


The Honorable George A. O'Toole
U S Court House
1 Court House way
Boston, Ma. 02210


Dear Judge O'Toole


I am writing this letter in behalf of Jose Silva.


I have known Mr. Silva for over 20 years. I worked for him as an electrician, I took care of his boat supply needs when I had my marine supply store on the water front, I worked together with him running the United Fishermen Club in New Bedford when he was the president and until today we always kept a good relationship. Today , although I am out of the boat supply business, we still good friends, have good conversations.

By what I understand from conversations that I have with Joe, the District Attorney is portraying Mr. Silva as a criminal. In his words, is like Joe had killed a human being. To me, Joe is a completely different person that what they trying to portray him. Does he sound arrogant  at times when he talks ? Yes he does , maybe to cover up some complex that he has, but deep inside, Joe is a good man. He opens up his heart to anybody  in need no questions asked. Always ready to help. He donates part of his time to the community, and as far as family is concerned I consider Joe a good family man. He is a good husband, good father, an excellent family man.

In summation, Joe did some things that he shouldn't do. He admits to that. In the last two years he has been thrown out of business, paid a small fortune in fines, lawyers fees etc..  but by knowing his character, he is not at all what they are trying to portray him of.

 I hope that my sincere words will help Joe on his difficult times and I wish him all the best.



Antonio Afonso

EXHIBIT L

March 13, 2006

The Honorable George A. O'Toole
U S Court House
1 Courthouse Way
Boston, MA. 02210

Dear Judge O'Toole,

Please accept this letter on behalf of Mr. Jose Silva.

I am the owner of Bay Fuel Inc. in New Bedford, MA.; we sell supplies to the fishing industry. In this capacity, I have been acquainted with Mr. Silva for several years when he was the Captain of a fishing vessel and later when he was the owner of the F/V Lutador I and F/V Lutador II.

In our business dealings, I have found Mr. Silva to be honest and loyal. He is a person who takes very seriously his obligations to others. I have trusted Mr. Silva with extended terms of credit for considerable sums and I have not been disappointed.

Over the years, our business relationship has evolved to one of friendship as well. We talk of our families often and I know of what he has sacrificed to meet his obligations. I believe Mr. Silva is a man of his word, and I hope I have been helpful to this cause.

Very truly yours,

Virginia Martins
President/Owner

EXHIBIT M

March 21, 2006

The Honorable George A. O'Toole
United State Court House
1 Courthouse Way
Boston, MA  02210

Dear Judge O'Toole,

Please accept this letter on behalf of Mr. Carlos Rafael.

I am the owner of Carlos Seafood, Inc an owed nineteen fishing vessel working out of New Bedford, MA port; we sell supplies to the wholesale and retailer industry.  In this capacity, I have become acquainted with Mr. Jose Silva fifteen years ago when he was a fisherman and later when he was a boat owner.

In our business dealings, I have found Mr. Silva to be honest and loyal.  He is a person who takes very seriously his obligations to others. I have trusted Mr. Silva with extended terms of credit for considerable sums and I have no been disappointed.

Over the years, our business relationship has evolved to one of friendship as well. We talk of our families' often and I know of what he has sacrificed to meet his obligations.  I believe Mr. Silva is a man of his word, and I hope I have been helpful to his cause.

Very truly yours,

Carlos Rafael

EXHIBIT N

March-25-2006

The Honorable George O'Toole

United States District Court

One Court House Way

Boston MA 02210


Dear Judge O'Toole,


Please accept this letter on behalf of Mr. Jose Silva. My name is Carlos Vinagre. I am 72 years old, the owner of several fishing vessels, and have known Mr. Silva since I came from Portugal to the United States about 36 years ago. I have found Mr. Silva to be honest, loyal and hardworking. Helping others has been a huge priority of his. He often is involved with his work and also financially in the community, helping to raise funds for people in need. I believe Mr. Silva is a man of his word and I hope I have been helpful to his cause.


Yours Truly,

Carlos Vinagre

EXHIBIT O

March 13, 2005

Honorable George A. O' Toole
United States District Court
One Courthouse Way
Boston, Ma 02210

Dear Judge O' Toole

My name is Antonio Oliveira and I am a fishing boat captain on the F/V Atlantic Star. I have known Jose Silva many years. For 30 years we were colleagues out fishing on the waters of the Atlantic (Northeast Coast) in this difficult life of a fisherman.

In the winter months we suffer from the cold and the frost, with rough seas almost always at our side, we never know if we will make it home alive. A fisherman never knows what he is going to get paid. If the boat is lucky on its catch and the prices of the catch are good then he has had luck to bring home a sufficient paycheck to provide for his family. If the fisherman is not in luck he comes home disappointed but with hope that the next trip he will be in better luck.

I have always known Jose Silva as a man that is generous, honest, understanding, hardworking, and always willing to help anyone.

Through destiny I believe that Jose out of desperation on an unlucky fishing trip may have made the wrong choice so he could help his crew make a paycheck and save the fishing trip.

He made a wrong choice to catch and save the female lobsters that the law does not permit fisherman to catch. In my heart I believe Jose Silva is innocent, he was not doing this out of malicious intentions but out of desperation.

I Antonio Oliveira captain of the F/V Atlantic Star would like to request that you could find a way to give Jose Silva a chance so his family is not destroyed because he has already suffered a lot in these past two years morally and financially.

Sincerely,

*Antonio Oliveira*

EXHIBIT P

Honorable George A. O' Toole
United State District Court
One Courthouse Way
Boston, Ma 02210

Re: Jose Silva                                    February 28 ,2006

Dear Judge O'Toole,

      I Diana Santos age 20 am residing in Elizabeth,New Jersey and currently on Dialysis due to kidney failure from Lupus, a chronic disease. In April 2005, I had a kidney transplant from a living donor , my mother Cristina Santos, but unfortunately I lost the kidney 10 months later. Jose Silva is known to me,my family, and friends a great man and true friend. Not only has he stuck by my side and given me the strength and hope that i need,hes organized a beautiful Fundraiser party which consisted of 700 people. Mr.Silva worked extremely hard to get all of those people to the party to help me. Hes been a wonderful man in my eyes and I say this because it's hard to find a honest and hard working man. I've known Mr. Silva for the past 9 years. He has been apart of my life and famlies life through the good and bad times , but most importantly hes stuck with me through the most difficult hospital stays. Mr. Silva is also a awesome father, husband and grandfather that i have wittnessed his compassion towards his family and friends. He is a very wise and strong person. Mr. Silva is also a very hard worker and has worked for the past twenty seven (27years) in the ocean, sailing and being a fisherman. I've known him to be a authentic person. I've also seen that the life that he has had at sea is a very hard job that he enjoys truely and sincerely is his passion, it's what he is known for "Jose the fisherman." He knows a great deal  kinds of fish, waters, and boats. Once again, Mr.Silva is a true man from the ocean. His life is at sea. And no matter how anyone else thinks or sees him as, I know the real Jose Silva, a wonderful hard worker.

                Thank You,
                signed
                *Diana Santos*

EXHIBIT Q

Amandio Pestana Jr.
126 Norman St.
New Bedford, MA 02744

Dear Judge George A. O'Toole
United States District Court
One Courthouse Way
Boston, MA 02210

Dear Judge O'Toole

    My name is Amandio Pestana, I am writing on behalf on my father-in-law Jose Silva. Your honor I became part of this family about nine years ago. It has meant so much to me that this man took me in as a part of this family at that time. Mr. Silva as I call him is a man who supports his family a 100%, who provides for his family with all the love that he has to offer.

    My father-in-law has been there for my wife and I, and the grandchildren, when times we're tough.  He's the man who would give his shirt off his back to help a family member or friend and dire need. Mr. Silva is a person I call my father-in-law, but deep inside he is my second dad, he's always welcome me with open arms into his home, that makes me feel this person is truly a well hearted man.

    The job that Mr. Silva had was a job that wasn't just for anyone. A fisherman's life is a hard life. They go through a great deal of hardships, example, harsh weather conditions, criticism, over-worked, and sacrificing watching his children grow to provide for them.  This man is out there working for his family, who he hardly sees, but when he is home, he makes it  a priority to see his family and grandchildren. Your honor that man I speak of is a person that treats me like his son, and to be seen in his eyes like that, gives me nothing but respect for Mr. Silva.

    Your honor this man has been marked as a "criminal". If you knew him you would say that it is nothing but false. My father-in-law has been through tremendous pain in the past few years. It's been real hard for a man to basically be brought down in this way. As his son-in-law, I would love to see this man be able to see his family and grandchildren again. This would devastate his kids, his wife, his grandchildren, and especially me not to see him again. He's a wonderful person, please let this family be whole.

                                        Sincerely,

                                        *Amandio Pestana*

                                        Amandio Pestana

EXHIBIT R

**BERGIE'S SEAFOOD, INC.**
P.O. Box 941
NEW BEDFORD, MA 02741
508/999-4447
FAX 508/991-3005

(508) 992-7711

| TRANSACTION | NUMBER | DATE | PAGE |
|---|---|---|---|
| PURCHASE | 64427 | 03/09/04 | 1 |

PAYMENT DUE BY ▶ 03/10/04

PURCH FROM
XXXXX U.S. Dept. Of Commerce/NOAA
XXXXX

SHIP TO

Bergie's Seafood, Inc.
P.O. Box B941
New Bedford, MA 02741-0941

| CUSTOMER NO. | CUSTOMER P.O. | SALES ORDER NO. | DATE SHIPPED | SHIPPED VIA | | |
|---|---|---|---|---|---|---|
| Collect | XXXXXXXXX | Check 22034 | 03/09/04 | FOB DESTINATION | | |

| QUANTITY | PRODUCT | DESCRIPTION | UNIT | PRICE PER UNIT | AMOUNT |
|---|---|---|---|---|---|
| 75.00 | 7274 | Large Lobster | LB | 4.00 | 300.00 |
| 90.00 | 7270 | Lobster Culls | LB | 3.00 | 270.00 |
| 850.00 | 7270 | Lobsters | LB | 4.60 | 3,910.00 |
| 300.00 | 7270 | Lobster Weaks | LB | 1.00 | 300.00 |

PAY THIS AMOUNT ▶ 4,780.00

TERMS: Due upon receipt.
TOTAL WEIGHT : 1315.00 LB

Thank you for your business and have a safe trip.
Multi Species Permit # 1393

ORIGINAL