UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 05-10011-GAO |
| | ) | |
| JOSE SILVA, | ) | |
| | ) | |
| Defendant. | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States respectfully submits this Memorandum in support of its sentencing recommendation. Having pleaded guilty to Counts One through Four of the Indictment, Defendant Jose Silva stands before this Court convicted of serious criminal offenses. His conduct consisted not of an isolated event as the defendant would have the Court believe, but a four year-long practice to exploit a fleeting natural resource for profit and to compel his crew members to keep quiet. For the reasons set forth below, the government recommends that the defendant be sentenced to a term of imprisonment of eighteen months, a punishment that appropriately would address the gravity of his conduct, vindicate the sacrifices of law-abiding fishermen, and send a firm deterrent message.

## I.    Summary of Offense Conduct

Silva was the owner and skipper of two New Bedford fishing vessels, the *F/V Lutador and F/V Lutador II*, on which he trawled for a variety of fish, including lobster. The indictment in this matter arose out of Silva's four-year long practice of directing his crew to remove the eggs of female lobsters – a practice that is verboten according to fishing industry custom and illegal under federal and state law – and ordering them to remain silent about the practice.

The Regulatory Background

To understand the context in which these events took place, a word about the regulatory regime governing the lobster fishery is necessary. The catching of American lobsters off the Atlantic Coast is regulated by the Atlantic Coastal Fisheries Cooperative Management Act ("ACFCMA"), 16 U.S.C. § 5101 et seq. and the regulations promulgated thereunder, Title 50, Code of Federal Regulations, Sections 697. The purpose of the ACFCMA is, among other things, to protect the American lobster fishery off the East Coast of the United States from over-fishing. Among the protections created by the ACFCMA are the regulations protecting female lobsters and capping the number of lobsters that may be caught during a single fishing trip. These regulations provide, among other things, that "it is unlawful for any person owning or operating a vessel issued a Federal limited access American lobster permit . . . to do any of the following:"

  a.  "Remove eggs from any berried female American lobster, land or possess any such lobster from which eggs have been removed;"

  b.  "Retain on board, land or possess any V-notched female American lobster;" and

  c.  "Possess, retain on board, or land lobster by a vessel with any non-trap gear on board capable of catching lobsters, in excess of 100 lobsters (or parts thereof), for each lobster day-at-sea, up to a maximum of 500 lobsters (or parts thereof) for any one trip . . . ."

These regulations codify two ancient customs in the industry that are meant to conserve the lobster fishery: that female egg-bearing lobsters must be returned to the sea to spawn new generations of lobsters, and that before throwing them back overboard, a fisherman should notch a "v" in their tales to signal to other fishermen that the lobsters are females capable of bearing

2

eggs.

## Silva's Conspiracy

Like other commercial fishermen, Silva and his crew were well aware of these legal obligations.  Nevertheless, over the course of four years, he directed his crew to retain all lobsters on board, and specifically instructed them to remove the eggs from female lobsters so that they might be sold undetected in port.  According to his crew, Silva personally demonstrated how the eggs were to be removed by means of a hose.  When crew members threw female lobsters back overboard, he reprimanded them.  Knowing that a sea captain has supreme authority at sea over his crew, Silva also instructed his crew not to tell authorities about what they were doing.  As a further means of concealment, Silva directed his crew to construct secret compartments in the fish holds of his vessels to store the scrubbed lobsters.  These compartments were hidden under ice and other fish, making it unlikely that the Coast Guard would ever find the lobsters in the course of an inspection.

Despite his efforts, the Coast Guard caught him.  On March 7, 2004, a boarding party from the U.S. Coast Guard cutter *Chinook* boarded the *Lutador II* near Quick's Hole as the vessel with its crew of five was returning from a twelve-day trip.  After conducting a routine safety inspection of the deck, the boarding officers proceeded into the vessel's fish hold to inspect the catch.  One of the boarding officers immediately noticed a banded lobster claw lying on the deck of the hold, prompting him to ask the defendant's son, Daniel Silva, whether there were lobster in the hold.  Daniel Silva replied, "No, only fish; no lobster."  He further explained that the only lobster on board was in a tank on the deck, and that the crew had eaten some lobster for dinner earlier in the trip.  The boarding officer then asked Daniel Silva to remove ice from

3

one of the fish pens (which are the stalls lining the perimeter of the hold in which fish are packed in ice). Spotting a lobster tail protruding from the ice, the officer again asked Daniel Silva whether there were any lobsters in the hold. Daniel Silva reiterated that there were none.

The officer then went up to the wheelhouse and posed the same question to Jose Silva, who responded that the only lobsters on board were in the tank on the deck. When the boarding officer resumed his inspection of the hold, he discovered underneath eight inches of ice and fish a shelf made of wooden planks stretching across the length of one of the pens. The officers pulled back the planks to discover hundreds of lobsters stacked on top of one another. They eventually discovered another pen similarly rigged with hundreds more. When they informed the defendant of their discovery, he feigned shock and produced a handwritten inventory of his catch, which listed two thousand pounds of lobsters, an amount, as it turned out, far less than what he knew was actually on board.

At that point, the *Lutador II* was nearing New Bedford where agents of the National Marine Fisheries Service and officers of the Massachusetts Environmental Police were waiting. Once in port, Jose Silva came down from the wheelhouse and complained loudly about the situation. He claimed that he knew nothing about the lobsters in the hold, and the mate (i.e., his son) was responsible for what went into the hold. Later, another crew member informed the agents that after the boarding, Silva instructed him to tell the Coast Guard that the crew was scrubbing lobsters all on its own, without Silva's knowledge. With the assistance of a biologist from the Massachusetts Division of Marine Fisheries, the law enforcement agents determined that among the catch of 1170 lobsters (3322 lbs), 594 lobsters had their eggs forcibly removed, ninety-two were "v-notched," and sixty-one were females bearing eggs. According to crew

members, Silva had been engaged in this practice for at least four years.

## II.    Sentencing Guideline Calculation

Pursuant to Paragraph 3 of the plea agreement, the parties agree that the applicable guideline is Section 2Q1.2 (November 2005 edition).  The parties agree that the guidelines are to be calculated as follows:

| | |
|---|---|
| Base offense level: | 6 |
| Offense committed for Pecuniary Gain | 2 |
| Loss over $30,000 | 6 |
| Role in the Offense | 2 |
| Obstruction of Justice | 2 |
| Acceptance of Resp. | -3 |
| Total: | 15 (18-24 months)[1] |

Calculating loss in this case is difficult.  The defendant's practice of directing his crew to scrub eggs from female lobsters stretched over four years and many fishing trips.  Not surprisingly, there are no records indicating how many female lobsters were scrubbed.  In order to calculate loss, one must make assumptions about the percentage of female lobsters in each lobster catch (a percentage that varies seasonally), the relative weight of female lobsters, and

---

[1] The defendant seeks a traditional departure on the ground that he has paid extraordinary restitution in a related matter.  See Def. Memo. at 9.  This argument should be rejected summarily on the ground that he paid a civil fine, not restitution.  See Settlement Agreement, attached as Exhibit C to Def. Memo.  His payments were not made voluntarily, but were required under the settlement agreement.  There is no authority that suggests that a departure is warranted on the ground that a defendant has paid a fine in a related civil enforcement matter.

retail lobster prices.

In light of these uncertainties, the parties agreed to a principled methodology to calculate loss.  The calculation is based on the assumption that half of the lobsters the defendant caught during the conspiracy period female (with the exception of the March 7, 2004 for which we know definitively the number of illegal lobsters).  It is also based on catches in the months of February, March and April.  This represents a compromise regarding the time of year when migrate into the deeper waters where Silva fished.  We then multiplied the size of each female lobster catch by the prevailing retail prices of lobster in Southeastern Massachusetts on the day of each catch.  These prices were calculated based on interviews of local fish store owners. Using this formula, we calculated a total loss of $37,240.[2]

## III.   Section 3553(a) Factors

Since the Supreme Court's decision in United States v. Booker, 125 S.Ct. 738, 755-56 (2005), courts may look beyond the guidelines to determine reasonable sentences that are sufficient, but not greater than necessary to comply with the purposes of sentencing in Title 18, U.S.C., § 3553(a).  Those factors include the following:

(a)     the nature and circumstances of the offense;

(b)     the history and characteristics of the defendant;

(c)     to reflect the seriousness of the offense;

(d)     to promote respect for the law;

---

[2] Probation calculated the loss to have been $69,993.  See PSR at 32.  There is no material difference between this figure and the parties' figure because both yield the same total offense level, and restitution is not required in this case.

(e)     to provide just punishment;

(f)     to provide adequate deterrence to criminal conduct;

(g)     to protect the public from further crimes of the defendant;

(h)     to rehabilitate the defendant;

(I)     the alternative sentences available; and

(I)     to avoid unwarranted sentence disparities by reference to the United States

         Sentencing Guidelines.

The Court of Appeals for the First Circuit recently held that Guidelines are to be the starting

point of a court's sentencing determination, and are to given substantial weight. United States v.

Jimenez-Beltre, ___ F.3d __, (1st Cir., March 9, 2006) (slip opinion at 7). The court observed that

"Guidelines cannot just be called 'another factor' in the statutory list" because they integrate

multiple factors and were promulgated by an expert body. Id. The court observed that "to

construct a reasonable sentence starting from scratch in every case would defeat any chance at

rough equality which remains a congressional objective." Id., (slip opinion at 9).

    For the following reasons, a sentence within the stipulated guideline range would be

would be reasonable, and the defendant has offered no compelling reason to deviate from it.

**A.     <u>The Defendant's Offenses Were Serious.</u>**

    The sentence in this case should reflect the seriousness of the defendant's convictions on

conspiracy, Lacey Act violations, and the making of false statements, as well as brazenness with

which he flaunted the rules of his industry and his exploitation of his position of authority.

    The prohibition on taking female lobsters is as old as the lobster fishery, and its purpose

is obvious: to preserve the lobster population so that the community of lobster fishermen may

continue to earn a livelihood.  The practice of cutting a v-notch into the tail of female egg-bearing lobsters grew out of this imperative as means by which fishermen could convey to one another which lobsters ought to be spared.  That the defendant caught ninety-two v-notched lobsters in his last trip suggests that fishermen observe this custom – at a cost to their short-term profit.

As discussed above, these customs have been codified in both federal and state law.  The defendant was well aware of these laws.  For at least four years, his greed overrode any consideration for the opportunity of other fishermen to avail themselves of the same natural resource.  Perhaps worst of all, by retaining the v-notched lobsters, he exploited the fair play of other fishermen who, contrary to their own economic self-interest, had returned to same lobsters to the sea.

The defendant was able to perpetrate this practice for so long  by exploiting his position of authority.  Knowing full well that he was breaking the law, the defendant instructed his crew not to tell anyone on shore that they scrubbed lobsters.  He gave these orders with the understanding that at sea the captain's orders are not to be questioned, and with the awareness that in an increasingly competitive labor market, his crew members could not afford to be fired, nor be perceived to be government snitches.[3]  When he was caught, the defendant not only lied to the Coast Guard, but attempted to convince a crew member to take the fall for him.  This effort to obstruct a government investigation should not be tolerated.

**B.**     **The Sentence Should Promote Respect for the Law and, In Particular, to**

---

[3] For this reason, it was hardly surprising that most of the crew members refused to testify in the grand jury.

8

### Vindicate Law Abiding Fishermen.

Commercial fishing is a tough business.  Despite significant strides in life-saving technology and resources, including the government's capability to locate sinking vessels nearly immediately through global positioning technology, the industry to this day has the highest occupational mortality rate.[4]  With the depletion of fish stocks have come heightened regulation, including rules that constrict  net size, limit the days at sea for vessels and fishermen alike, impose catch quotas, and close areas of the ocean that may be fished.  To succeed in the industry today requires not only fortitude, but an awareness of the rules.  Given the inherent difficulty in monitoring which vessel is catching what, it also requires that captains abide by the rules when they know that no one is watching.  The vast majority of commercial fishermen comply with the rules despite their complexity and the omnipresent dangers of their profession.

The sentence in this case should vindicate those fishermen.  In particular, it should affirm that those fisherman who threw back the v-notched lobsters kept by the defendant did the right thing.  Sentencing the defendant to probation in this case would be viewed as "letting him off" and would convey to them that their honorable efforts were futile, if not foolish.

### C.    The Sentence Should Be Sufficient to Deter Similar Conduct.

The flip side of vindicating law abiding fisherman is deterring the few who would be tempted to flaunt the rules as the defendant did.  The sentence in this matter should be stern not only because the conduct was serious, but because general deterrence is particularly important in an industry in which detecting regulatory violations is exceedingly difficult.  The Coast Guard

---

[4] See www.bls.gov.

9

after all cannot possibly board every one of the thousands of vessels landing in New England

ports. That the Coast Guard happened upon the defendant's vessel in March 2004, was a

function of luck and good police work. Nor is NOAA's Office of Law Enforcement, the agency

principally charged with fisheries enforcement, capable of searching every vessel that comes

ashore. Moreover, both agencies require accurate information not only to enforce fisheries

regulations, but, in the case of the Coast Guard, to ensure vessel safety and port security. False

statements to the Coast Guard undermines its ability to its many jobs. The sentence must make

clear to the regulated community that although there are ways to avoid detection, if you happen

to get caught, and particularly if you lie about what you did, you will pay a steep price.[5]

> **D.    The Defendant's Arguments for a Sentence Below the Agreed-Upon Range Are Unavailing.**

The defendant advances a series of arguments that he should receive a sentence below the

applicable guideline range. See Def. Memo. at 12-25. The government addresses briefly below

why the Court should give these arguments little weight.

> **1.    The Defendant Stands Convicted of Engaging in a Four Year Long Conspiracy.**

The defendant contends that "on the March 2004 trip at issue in this case" he let

"emotion" get the best of him and he decided to keep "illegal lobsters" in violation of "detailed

and rigid regulations." See Def. Memo at 14-15. This case, however, is not about one trip or

one indiscretion; rather, at his Rule 11 hearing, the defendant pleaded guilty to a four-year long

---

[5] The sentence imposed in this case will be heard by a broad audience. With the highest fish landing value of any port several years running, New Bedford is the preeminent fishing port in the United States. See www.noaa.gov.

conspiracy in which he directed crew members to scrub lobsters. The defendant's conduct was deliberate and continuous, and he well knew that it flew in the face of a simple rule every fisherman was aware of; that is, you must throw female lobsters back into the ocean. The defendant violated the law not out of emotion, but because of greed.

> **2.      The Court Should Give Little Weight to the "Ex-Vessel" Price of the Lobsters.**

The defendant contends that the loss in this case of $37,240 – a figure to which he stipulated – overstates the seriousness of the offense in that his personal gain from the offenses was far less. Whereas "loss" as defined by the Sentencing Guidelines under the circumstances here is based on retail price, the defendant states he sold lobster based on the "ex-vessel" price, which is far lower.

The Court should discount this argument as it is well-recognized that the defendant's gain is ordinarily less than – and underestimates – the loss calculated under the guidelines, which is usually the loss attributable to the victims of the offense. United States v. Snyder, 291 F.3d 1291, 1295 (11th Cir. 2002). To base the defendant's sentence on what is in effect a "manufacturer's price" would contravene the sentencing guidelines and invite wild disparity in the calculation of loss, not only in environmental cases, but in others as well.

> **3.      The Defendant's Effort to Obstruct Justice Was Not "Minimal."**

The defendant contends that his obstructive conduct was "minimal," in that he merely denied breaking the law. See Def. Memo. at 18. The Court should reject this argument for two reasons. First, lying to the Coast Guard are not innocuous. As discussed above, the Coast Guard enforces not only environmental laws but also ensures vessel safety and port security, and requires accurate information to do its many jobs. The Court should strive to deter lying to the

Coast Guard.  Second, the defendant neglects to mention at all his attempt the day of the Coast

Guard's boarding to convince one of crew members to accept the blame for the illegal lobsters.

Witness tampering is a serious obstructive act, and the Court should treat it as such.

>    **4.    The Information Provided by the Defendant was General in Nature and Did Not Amount to Substantial Assistance.**

The defendant asserts that his cooperation with the government should be credited.  <u>See</u>

Def. Memo. at 19.  In response, the government notes that the defendant submitted to a proffer

session.  The information he provided was general in nature, and did not amount to "substantial

assistance."

>    **5.    The Court Should Reject the Defendant's Comparisons to Recent Sentences in Other Environmental Cases.**

The defendant urges the Court to sentence him to probation in light of the sentences in

two recent cases in this district involving "far greater degradation to the environment."  <u>See</u> Def.

Memo. at 21.  Specifically, the defendant notes that (1) in the government's recent prosecution

of Mediterranean Shipping Company, Ship Management (Hong Kong) ("MSC"), a multi-

national shipping conglomerate, the chief engineer responsible for acts of deliberate oil pollution

was sentenced to sixty days imprisonment; and (2) the mate at the helm of the tug involved in the

Buzzards Bay Oil Spill of April 2003 received five months imprisonment.

The Court should reject this argument on both factual and legal grounds.  First, the

defendant invites the Court to supplant the careful categorization of cases embodied in the

sentencing guidelines.  Comparing cases in ways that the guidelines do not address would usher

in unwarranted sentencing disparities that the guidelines are designed to prevent.  The guidelines

are the starting point of the sentencing analysis specifically because Sentencing Commission, an

expert body that crafts the guidelines in light of sentencing practices throughout the country, is in a far better position that any given court to ensure sentencing uniformity.  See  United States v. Jimenez-Beltre, ___ F.3d __, (1ˢᵗ Cir., March 9, 2006) (slip opinion at 7).

Moreover, this case differs from the other two cited by the defendant in significant ways. The undersigned Assistant United States Attorney was assigned to both of those cases.  In neither the MSC nor the Buzzards Bay Spill prosecutions were the defendants motivated by pecuniary gain.  They committed criminal acts in the performance of their job duties.  In neither case, did the conduct last anywhere as long as in this case.  The chief engineer in the MSC was engaged in acts of pollution for two months, and the Buzzards Bay Spill involved a single accident.  In the MSC case, the defendant had been detained as a material witness in Boston in the eleven months prior to his sentencing.  He also had health problems.  In the case of the Buzzards Bay Spill, the conduct was negligent, not deliberate.  In neither case, did the defendants exploit the good will of others.  In short, the cases have little in common.

**IV.**    <u>**Sentencing Recommendation**</u>

In order to address the seriousness of the defendant's offenses, to vindicate law abiding fishermen, and to deter others from engaging in similar conduct, the government recommends that the defendant be sentenced to a period of incarceration of eighteen months, followed by three years supervised release, no fine, and a four hundred dollar special assessment.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney


 /s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
Assistant U.S. Attorney

Date: April 19, 2006

14